**GENERAL MOTORS CORPORATION, a Delaware Corporation, Petitioner,**

v.

**William D. RUCKELSHAUS, Administrator, United States Environmental Protection Agency, Respondent. (3 cases)**

**Nos. 80–1868, 80–2027 and 81–1029.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 25, 1984.

Decided Sept. 7, 1984.

Theodore Souris and George F. Ball, Detroit, Mich., with whom Michael B. Lewiston, James A. Smith, Terrance B. Larkin, Frederick J. Dindoffer and William L. Weber, Jr., Detroit, Mich., were on brief, for petitioner in Nos. 80–1868, 80–2027 and 81–1029.

Jose R. Allen, Atty. Dept. of Justice, Washington, D.C., with whom A. James Barnes, Gen. Counsel, Gerald K. Gleason, Asst. Gen. Counsel, Robert A. Weissman, Samuel I. Gutter, Attys., E.P.A., David E. Dearing and John Wittenborn, Dept. of Justice, Washington, D.C., were on brief, for respondent.

Angus MacBeth, Donald W. Stever, Jr. and Rosanne Mayer, Attys. Dept. of Justice, Washington, D.C., also entered appearances for respondent.

Before ROBINSON, Chief Judge, WRIGHT, TAMM, WILKEY, WALD, MIKVA, EDWARDS, GINSBURG, SCALIA and STARR, Circuit Judges, and BAZELON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge WALD.

Dissenting opinion filed by Senior Circuit Judge BAZELON in which Circuit Judges TAMM and WILKEY join.

WALD, Circuit Judge.

In this appeal, the General Motors Corporation (GM) challenges the authority of the Environmental Protection Agency (EPA or Agency) to require manufacturers, as a part of a recall pursuant to the Clean Air Act, to repair cars and engines, which are members of the recall class, but which have exceeded their statutory "useful lives" of five years or 50,000 miles at the time of repair. In 1980, the EPA promulgated what it termed an "interpretive rule," embodying its consistent regulatory practice since the enactment of the Clean Air Act Amendments of 1970, requiring manufacturers to repair all members of a recall class, regardless of their age or mileage at the time of repair. Soon thereafter, in accordance with the interpretative rule, the agency ordered GM to submit a remedial plan for a class of recalled Cadillacs that included all class members regardless of age or mileage. In its petitions to this court, GM contends that (1) the EPA rule is a legislative, not interpretative, rule, and therefore the rule is void for failure to comply with the notice and comment procedures set down by the Administrative Procedure Act, and (2) in any event, the rule runs counter to the recall provision of the Clean Air Act and therefore is an invalid interpretation of the statute. GM consequently challenges the validity of both the interpretative rule and the agency order that applied the rule to the recall of GM automobiles. For the reasons stated below, we hold that the EPA rule is a valid interpretative rule, supported by the language, purpose and legislative history of section 207(c) of the Clean Air Act Amendments of 1970. We accordingly deny GM's petitions.

## I. BACKGROUND

On March 21, 1977, after an EPA investigation and testing by both EPA and GM, the Administrator of the EPA notified GM pursuant to section 207(c)(1) of the Clean Air Act that the class of 1975 Cadillacs with type 230-carburetors did not conform with federal standards for carbon monoxide emission, and ordered GM to "submit a plan for recalling and remedying the nonconformity of the vehicles."[1] At the same time, the Administrator expressed concern that another set of 1975 Cadillacs—with type 193-carburetors—also exhibited nonconformity with the carbon monoxide standards, but he refrained from initiating a formal recall of that class in order to give GM an opportunity to substantiate its "strong protestations" that this latter class did not violate the standards. *See* Letter from Douglas M. Costle, EPA Administrator, to E.M. Estes, President of GM (March 21, 1977), *reprinted in* Joint Appendix (J.A.) at 122–24.

Five weeks later, GM filed a proposed remedial plan for the 230-carburetor Cadillacs, and as a part of the plan offered to recall the 193-carburetor Cadillacs voluntarily.[2] *See* J.A. at 126–27. EPA did not approve the plan, however, and negotiations continued for two years between the agency and GM over the effectiveness of the proposed repairs and the manufacturer's obligation to audit the performance of

---

1. Letter from Douglas M. Costle, EPA Administrator, to E.M. Estes, President of GM (March 21, 1977), *reprinted in* Joint Appendix (J.A.) at 122–24. While it was and is the agency's policy to encourage voluntary recalls, the Administrator "fe[lt] compelled to issue th[e] order" because "General Motors' acquiescence to recall comes at the end of more than two years of EPA investigation and GM opposition, and after assemblage of the most convincing case yet for recall." *Id.* Moreover, the Administrator expressed "some concern over the likelihood of actual implementation by dealers of the remedy proposed by General Motors and wish[ed] to preserve [the] right to approve the remedy to be actually pursued." *Id.*

2. The remedial plan initially submitted by GM covered "all 1975 Cadillac models except those built with California Emission Controls." Remedial Plan for 1975 Cadillacs (April 27, 1977), *reprinted in* J.A. at 129. The plan specifically provided that "[a] vehicle affected will be eligible for repair under the remedial plan, regardless of vehicle age, mileage, or owner." *Id., reprinted in* J.A. at 131.

completed repairs. Finally, on December 26, 1979, the EPA withdrew its demand that GM conduct an audit, deciding instead to conduct the audit itself, and approved GM's amended remedial plan.[3]

At that time, however, GM urged the EPA to cancel the recall, arguing that "as a direct result of the delays incurred since our first remedial plan was submitted, a point of drastically diminished returns has been reached." Letter from T.M. Fisher, Automotive Emission Control Director for GM, to Benjamin R. Jackson, EPA Deputy Assistant Administrator for Mobile Source and Noise Enforcement (Feb. 5, 1980), *reprinted in* J.A. at 258. More specifically, GM contended for the first time that "only those vehicles within the lesser of five years or 50,000 miles of operation at the time of presentation to the dealer for repairs will receive the [remedial repairs] at General Motors [sic] expense."[4] *Id., reprinted in* J.A. at 259. GM thus believed that so few Cadillacs in the class would be subject to recall because of their age or mileage that the recall should not be implemented at all.

On May 30, 1980, the EPA promulgated the rule at the center of dispute in this case. *See* 45 Fed.Reg. 36,396 (May 30, 1980). Under the rule, all remedial plans filed under section 207(c) of the Clean Air Act "shall provide that the manufacturer will remedy, at the manufacturer's expense, all properly maintained and used vehicles which experienced the nonconformity during their useful lives *regardless of their age or mileage at the time of repair.*" 40 C.F.R. Subpart S App. A (em-

phasis added). Applying this rule to the recall of the 1975 Cadillacs, the EPA on June 23, 1980, approved GM's Cadillac remedial plan insofar as it applied to vehicles within their useful lives at the time of repair, and ordered GM to submit a plan for the repair of automobiles within the recall class "which failed or will fail to conform to applicable emission standards during their useful lives but will be beyond their useful lives at the time of repair." Letter from Charles N. Freed, EPA Acting Assistant Deputy Administrator for Mobile Source, Noise and Radiation Enforcement, to T.M. Fisher, Director of Automotive Emission Control for GM (June 23, 1980), *reprinted in* J.A. at 263.

GM then petitioned this court, challenging both the May 30 rule and the June 30 recall determinations.[5] GM argues that (1) the May 30 rule constituted a legislative rulemaking, despite EPA's characterization of the rule as "interpretive," and therefore the EPA failed to follow the notice and comment procedures required before such rules may be promulgated, and (2) by requiring the repair of automobiles beyond their useful lives, the rule exceeds the EPA's authority under section 207(c) of the Clean Air Act. For the reasons explained below, we disagree with both of GM's contentions.

## II. THE EPA RULE IS AN INTERPRETATIVE RULE

EPA styled its May 30 rule as an "interpretive rule." *See* 45 Fed.Reg. 36,396 (May 30, 1980). As a preliminary matter, GM challenges this characterization, contending that the May 30 rule is, on the

3. *See* Letter from Benjamin R. Jackson, Deputy Assistant Administrator for Mobile Source and Noise Enforcement, to T.M. Fisher, Director of GM Automotive Emission Control (Dec. 26, 1979), *reprinted in* J.A. at 252–55.

4. GM contends that its 1980 letter merely restated a position it had taken a year earlier in negotiations with the EPA. *See* GM Brief at 5. EPA, however, asserts that the letter represents "the first time that GM had proposed to impose a 5/50 [useful life] limitation on a remedial plan." EPA Brief at 11. Nothing in the record

shows that GM presented this limitation prior to its 1980 letter.

5. On November 26, 1980, the EPA published a notice in the *Federal Register* declaring its partial approval and partial disapproval of GM's remedial plan to be "final." *See* 45 Fed.Reg. 78798 (Nov. 26, 1980). GM subsequently filed a protective petition, consolidated with its previous appeals, seeking review of this *Federal Register* notice.

contrary, a "legislative rule" and is consequently void for failure to follow the notice and comment procedures required for the promulgation of such rules. *See* 5 U.S.C. § 553. Because we find that EPA properly categorized the May 30 rule, we conclude that notice and comment procedures were not required. *See id.* § 553(b)(A).[6]

 In a turn of phrase particularly apt in this case, the distinction between legislative and nonlegislative rules has been described as "enshrouded in considerable smog." *American Bus Association v. ICC*, 627 F.2d 525, 529 (D.C.Cir.1980) (quoting *Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir.1975) (discussing definition of "general statement of policy")). Nonetheless, there are certain general principles that aid reviewing courts in making the determination whether a given rule is legislative or interpretative. First, the agency's own label, while relevant, is not dispositive. *See, e.g., Chamber of Commerce v. Occupational Safety and Health Administration*, 636 F.2d 464, 468 (D.C.Cir.1980); *Citizens to Save Spencer County v. EPA*, 600 F.2d 844, 879 n. 171 (D.C.Cir.1979). An interpretative rule simply states what the administrative agency thinks the statute means, and only " 'reminds' affected parties of existing duties." *Citizens to Save Spencer County*, 600 F.2d at 876 & n. 153;

*see also Chamber of Commerce*, 636 F.2d at 469. On the other hand, if by its action the agency intends to create new law, rights or duties, the rule is properly considered to be a legislative rule. *See, e.g., American Postal Workers Union v. United States Postal Service*, 707 F.2d 548, 558–59 (D.C.Cir.1983); *Citizens to Save Spencer County*, 600 F.2d at 876.

In light of these general principles, we find that the May 30 rule constitutes an interpretative rule. We note, to begin with, that the agency regarded its rule as interpretative. *See* 45 Fed.Reg. 36,396 (May 30, 1980) ("*Action:* Interpretive Rule"). Moreover, EPA's entire justification for the rule is comprised of reasoned statutory interpretation, with reference to the language, purpose and legislative history of section 207(c). *See id.* at 36,397–98. Indeed, the language of the rule itself indicates its interpretative nature. *See* 40 C.F.R. Subpart S App. A ("The purpose of this rule is to set forth EPA's interpretation ... under section 207(c)(1) of the Clean Air Act....") Finally, and most importantly, the rule did not create any new rights or duties; instead, it simply restated the consistent practice of the agency in conducting recalls pursuant to section 207(c).[7]

 Accordingly, we hold that the May 30 rule was an interpretative rule. The

---

**6.** The APA exempts from its notice and comment procedures "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). Similarly, the Clean Air Act exempts from its special rulemaking procedures "any rule or circumstance, referred to in subparagraphs (A) or (B) of subsection 553(b) of title 5." 42 U.S.C. § 7607(d)(1). Accordingly, interpretative rules are not subject to the procedural requirements set down by either the APA or the Clean Air Act.

**7.** The dissent contests this proposition and calls it "a proposition upon which the majority places substantial weight." Diss.Op. at 1574. At the outset, it should be made clear that this proposition is significant primarily in support of the conclusion that the EPA rule is *interpretative,* and not legislative, a proposition with which the dissent agrees. *See* Diss.Op. at 1573 & n. 3.

In its attempt to make light of the EPA's historical adherence to its current interpreta-

tion, the dissent asserts that the EPA interpretation has only "a lifespan barely exceeding one year" because the sole *controversy* over the interpretation occurred in 1979. *See* Diss.Op. at 1574 n. 11. However, as the EPA observed when it issued its interpretive rule "[i]n the past, manufacturers have not conditioned a vehicle's eligibility for recall repair ... on the basis of the vehicle's age or mileage." 45 Fed. Reg. at 36,397. Rather than diminishing the rule's status as a longstanding EPA interpretation, the absence of any prior controversy over the repair of cars exceeding their useful lives demonstrates the reasonableness of the EPA's interpretation of its own regulatory scheme. *See, e.g., Esquire, Inc. v. Ringer*, 591 F.2d 796, 801 (D.C.Cir.1978) (Bazelon, J.) (administrative interpretation deserves "controlling weight," particularly when it "has been consistently followed for a significant period of time"), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979); *DeLano v. United States*, 183 Ct.Cl.

EPA therefore was not required to follow notice and comment procedures prior to the adoption of the rule. *See* 5 U.S.C. § 553(b)(A). We now consider whether the interpretative rule is valid under section 207(c) of the Clean Air Act.

### III. THE EPA RULE IS A PERMISSIBLE INTERPRETATION OF SECTION 207

The EPA's May 30 rule finds substantial support, and no contradiction, in the language and legislative history of section 207 of the Clean Air Act. Moreover, the May 30 rule effectuates important public policy

379, 393 F.2d 517, 521 (1968) ("A strong indication of the reasonableness of that [administrative] construction is the fact that [the regulated parties] never challenged it" even though it was "consistently maintained by the agency."). Apparently, virtually every manufacturer engaging in a recall has voluntarily included older cars in its own remedial plans.

The dissent mistakenly speculates that "manufacturers in previous recalls have failed to raise the question of liability for repair of cars beyond their useful lives because the involvement of such vehicles in the recalls has been *de minimis*." Diss.Op. at 1574 n. 12. The dissent here loses sight of the facts. Despite its view that "virtually all" of the recalls involved tiny percentages of older cars, in six out of the fifteen recalls described in detail in the record, *see* J.A. at 278–96, the EPA issued a recall notice to the manufacturer 34–55 months after the cars were on the market. Under EPA's method of calculating the percentage of cars recalled that were beyond their useful lives, *see* J.A. at 275, these recalls involved large quantities of older cars. For example, the Pontiac recall, initiated in 1979, involved 1975 model year cars, *54%* of which were beyond their useful lives. *See* J.A. at 293. Moreover, almost *30%* of the 1976 Pontiacs involved in that recall had exceeded their useful lives at the time of manufacturer notice. Similarly, in 1978 EPA initiated a recall that included 1975 Fords, approximately *28%* of which had exceeded their useful lives. *See* J.A. at 289. Also, in 1978 the EPA began a recall that included 1974 AMC cars sold in California, approximately *56%* of which were beyond their useful lives. *See* J.A. at 291–92. Any manufacturer who "prophetically foresaw" the dissent's position, Diss.Op. at 1574 n. 12, believing these recalls exceeded the legal scope of coverage, could reasonably have been expected to make an objection.

Moreover, at least three other recalls included substantial numbers of olders cars. *See* J.A. at 280 (1974 Pontiacs; approximately 22% beyond useful lives); J.A. at 288 (1975 Fords; approxi-

goals embodied in the Act. Accordingly, we uphold the validity of the EPA rule at issue in this case.

■ The Supreme Court has recently outlined our proper task in reviewing an administrative construction of a statute that the agency administers. First, we must determine whether Congress "has directly spoken to the precise question at issue." *Chevron, U.S.A. v. National Resources Defense Council,* —— U.S. —— at ——, 104 S.Ct. 2778 at 2781, 81 L.Ed.2d 694 (1984). If the administrative construction

mately 16% beyond useful lives); J.A. at 296 (1977 Buicks; approximately 28.5% beyond useful lives).

The dissent obfuscates the issue by claiming that the above discussion "neglect[s] the fact" that some of these recalls included younger cars in addition to older cars, and that the "AMC recall was complicated by the more stringent emissions standards" applicable only in California. Diss.Op. at 1574 n. 12. However interesting, these details are irrelevant to the dissent's assertion that the manufacturers "failed to raise the question of liability for repair of cars beyond their useful lives because the involvement of such vehicles in the recalls has been *de minimis*." *Id.* The recall of younger cars in addition to older cars in no way detracts from the fact that *there were substantial numbers of older cars involved in these recalls.* The relevance of the California air emission standards to the dissent's position is at best obscure.

In a final aside, the dissent invokes the fact that "owner responses to recalls drop dramatically with the age of the vehicle." *Id.* Such statistical sport, however, ignores the fact that the manufacturer incurs heavy costs—both financial and good will—simply by issuing its *notice* to owners. Moreover, while the response rate declines as time goes by, *the percentage of older cars in the recall sales rises commensurately. See* J.A. at 275, 298. Therefore, whatever the age of the recall class, the manufacturer would still have a substantial stake and ample incentive to raise the useful life issue.

In sum, the dissent fails in its attempts to transmogrify *the absence of controversy* over the EPA's policy into *the absence of any EPA policy* on the useful life limitation. Taken individually or cumulatively, the dissent's efforts to invent *post hoc* rationalizations for the manufacturers' failure to challenge the EPA's policy are similarly unconvincing. The EPA has consistently approved only those remedial plans that included all cars and engines in the recall class, regardless of their age or mileage. It therefore constitutes a longstanding administrative policy.

runs counter to clear congressional intent, then the reviewing court must reject it. *See id.* at —— n. 9, 104 S.Ct. at 2782 n. 9; *see also FEC v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981). On the other hand, if the administrative construction does not contravene clearly discernible legislative intent, then the reviewing court "does not simply impose its own construction on the statute." *Chevron,* slip op. —— U.S. at ——, 104 S.Ct. at 2782. Instead, we then must conduct the "narrower inquiry into whether the [agency's] construction was 'sufficiently reasonable' to be accepted by a reviewing court." [8] *Democratic Senatorial Campaign Committee,* 454 U.S. at 39, 102 S.Ct. at 46; *see Chevron,* slip op. —— U.S. at ——, 104 S.Ct. at 2782.

■ We begin our review with an examination of the statute. Section 207(c)(1) provides, in pertinent part:

> If the Administrator determines that a substantial number of any class or category of vehicles or engines, although properly maintained and used, do not conform to the [EPA emission standards], when in actual use throughout their useful life (as determined under section 7521(d) of this title), he shall immediately notify the manufacturer thereof of such nonconformity, and he shall require the manufacturer to submit a plan for remedying the nonconformity of the vehicles or engines with respect to which such notification is given.

42 U.S.C. § 7541(c)(1). The EPA interprets this provision to authorize the recall of all members of a nonconforming class, except those not "properly maintained and used," regardless of the age or mileage of any given member. We think the statute provides ample support for such an interpretation.

The statute requires manufacturers to submit remedial plans for "vehicles or engines with respect to which ... notification is given," and directs the EPA Administrator to give such notification with respect to a "class or category of vehicles or engines," a substantial number of which exhibited nonconformity during their useful lives. The statute thus provides for notice on a classwide basis and further requires the manufacturer to remedy all cars with respect to which such notice is given. In light of this class-based orientation of section 207(c)(1), we think the EPA reasonably mandated that remedial plans be designed to cover all members of a recall class. The agency reasonably required the manufacturers to include a car or engine in their remedial plans if (1) a substantial number of cars within a given class exhibited nonconformity during their useful lives, and (2) the car is a member of that class. Section 207(c) affords an ample basis for this requirement.

GM nevertheless argues that individual vehicles and engines that have exceeded their useful lives cannot possibly exhibit a "nonconformity," because the Clean Air

---

**8.** It is difficult to square the dissent's position with these recent pronouncements by the Supreme Court. Although the dissent attempts to invoke the "plain meaning of the statute," Diss. Op. at 1576, in truth it argues only that the useful life limitation should be imported into the recall provision. *See id.* at 1575–1576. However, nothing in the language or legislative history of the recall provision compels this result. *See infra* at pp. 1578–1580. The absence of a useful life limitation in the recall provision should be compared with the *express* limitation of the manufacturer's liability under the *warranty* provision for emissions violations occurring during a vehicle's "useful life." *Compare* 42 U.S.C. § 7541(c)(1) (recall provision) *with id.*

§ 7541(a) (warranty provision). *See infra* at pp. 1570–1571.

Similarly, the dissent's extensive dicta, setting out what it dubs "some reasonable alternatives," *see* Diss.Op. at 1582–1584, is particularly inappropriate in light of the Supreme Court's recent warning that reviewing courts should respect the policy choices of administrative agencies. *See Chevron,* slip op. —— U.S. at ——–——, 104 S.Ct. at 2793–94. The question presented today is whether the agency's action is a reasonable one in light of the existing statutory constraints, and it is not the job of the courts to propose rules that they would prefer the agency to adopt.

Act's emission standards apply only to vehicles and engines within their useful lives. *See* 42 U.S.C. § 7521(a)(1). Since section 207(c) requires manufacturers to devise remedial plans so that a recall will "remedy the nonconformity" of the class, GM concludes that its remedial obligations extend only to those members of a recall class that are within their useful lives at the time of repair.

However, while it is true that the emission standards apply only to individual cars and engines during their useful lives, it does not follow that only those cars and engines within their useful lives may be recalled. Indeed, the question presented by this case is whether a member vehicle or engine of a recall class that has exceeded its useful life should nevertheless be repaired under section 207(c) at the manufacturer's expense. That question is not settled by the definition of "useful life"; rather, it turns on the intended scope and purpose of the recall provision. As we have explained above, section 207(c) provides for classwide remedies of classwide defects. Accordingly, EPA reasonably reads the section to require the manufacturers to submit plans to "remedy the nonconformity" *of the recall class*. After all, a defective *class*—the members of which do not satisfy the emission standards during their

useful lives—can be considered "nonconforming." Hence the May 30 rule is not precluded by the statute's definition of "useful life."

Moreover, assuming *arguendo* that only individual cars and vehicles within their useful lives could exhibit a "nonconformity," a plan "for remedying the nonconformity" could still include cars or engines beyond their useful lives at the time of repair. Through the recall scheme, Congress obviously intended the EPA to conduct tests on representative samplings of cars and engines, and to base its decision to recall on such tests.[9] Unless Congress wanted the EPA to test every car in a class—an absurd prospect—it was willing to allow a statistical inference from representative testing that all members of the class exhibit a nonconformity during their useful lives. Once it is established that a car was out of compliance with emission standards during its useful life, a reasonable remedy could include the repair of the car to compensate for the pollution caused during the time of its violation. Therefore, once the EPA establishes that members of a recall class were generally nonconforming during their useful lives, a reasonable method of "remedying the nonconformity" includes the repair of all members of the class, even if some had exceeded their useful lives.[10] We

---

9. The dissent erroneously concludes that the EPA rule "would expose the manufacturer to liability for repair virtually indefinitely." Diss.Op. at 1579. The statute, however, authorizes the Administrator to institute a recall only after determining that a substantial number of vehicles or engines in the class "do not conform to the [emission standards] *when in actual use throughout their useful life.*" 42 U.S.C. § 7541(c)(1) (emphasis added). Since cars and engines *older than five years of age* are no longer within their useful lives, this statutory condition cannot be met "indefinitely." There is, at the very least, this definite time limitation on the Administrator: he must conclude his testing before the entire recall class has exceeded five years of age.

Moreover, special problems might arise when a proposed recall class includes numerous model years of a particular car or engine, some of which have entirely exceeded their useful lives at the time the EPA conducts its testing. *See*

Diss.Op. at 1579 (hypothesizing such a class). The design of some features of a class of cars or engines might be altered from one model year to another. If these changes could affect the level of auto emissions, then the EPA's testing of only the models within their useful lives might not be conclusive as to the nonconformity of the *entire* class proposed for recall. However, since the recall class presented in this case does not raise this problem, we need not decide this hypothetical. Suffice it to say that our reading of the statute amply permits the EPA to recall cars and engines regardless of their age at the time of recall. We do not address today the possible constraints upon the EPA in defining the reasonable scope of a recall class.

10. At oral argument and in its supplemental brief, the EPA attested to its flexibility in devising appropriate and reasonable remedial schemes for older cars and engines. We do not find, and GM does not contend, that the remedy

note that, under the EPA rule, if a certain car or subclass of cars were in compliance during the five year or 50,000 mile period, then the manufacturer need not repair that car or subclass of cars.[11] *See* 45 Fed.Reg. 36,397 n. 2 (May 30, 1980) ("the manufacturer is not responsible to remedy the nonconformity of a vehicle which, although part of the recall class, experienced the nonconformity only after expiration of the vehicle's useful life").

The legislative history similarly supports EPA's interpretive rule. The Report of the Senate Public Works Committee—upon which GM heavily relies, *see infra* at p. 1570 —refers to the recall of an entire "model or class" of vehicles or engines. S.Rep. No. 1196, 91st Cong., 2d Sess. 29 (1970). The Senate Committee bill designed two methods for EPA to assure in-use compliance with emission standards. First, after the development of a "quick test" method, the EPA could test the continuing compliance of "individual vehicles on the road." *Id.* Alternatively, the EPA could conduct more intensive examinations of "representative sample[s] of a model or class," and, after a finding of classwide noncompliance, EPA "could require the manufacturer to recall that model or class." *Id.; see id.* at 111 (section 207 of S. 4358) (if EPA finds that "statistically representative samples of any class or category of vehicles or vehicle engines ... do not conform," then all "vehicle engines included within the class or category" should be

notified); *id.* at 62–63 (section-by-section analysis) after the EPA "discovers defects through testing" of a class of vehicles or engines, it "shall order the manufacturer to notify ... purchasers *of the defect* ") (emphasis added).

Furthermore, when Congress revisited section 207(c) in 1977, the discussion assumed that the recall provision extended to all member vehicles or engines of the nonconforming classes. *See, e.g.,* H.Rep. No. 294, 95th Cong., 1st Sess. 497, U.S.Code Cong. & Admin.News 1977, pp. 1077, 1459 ("if a substantial number of systems fail during their on-the-road operation, the EPA can recall the entire lot for repair at the manufacturer's expense"); *id.* at 498, U.S. Code Cong. & Admin.News 1977, p. 1460 (noting the possibility of "a recall of all of that model vehicle or engine type"); 6 Environmental Policy Division of the Congressional Research Service of the Library for the Comm. on Environment and Public Works, 95th Cong., 2d Sess. 4540 (1978) (preliminary statement of Sen. Bentsen) ("section 207(c) authorizes the Agency to require the automaker to recall *a given model run for needed repairs* if the Agency determines that a substantial number of that model or engine type do not conform to the standards when in actual use") (emphasis added); *id.* at 1220 (preliminary statement of Sen. Riegle) ("If a substantial number of systems fail during their on-the-road operation, the EPA can recall the entire lot for repair at the manufactur-

---

proposed for the Cadillacs in this case is unreasonable.

**11.** The dissent complains that "the EPA's rule establishes an absolute and irrebutable presumption that *all* older cars were among the percentage failing to meet standards during their useful lives." Diss.Op. at 1582. However, it is the *statute* that establishes the presumption that the cars and engines within a class exhibiting substantial nonconformity are individually nonconforming. Moreover, this presumption is not "absolute and irrebuttable"; the manufacturer is free to come forward with evidence that an individual car or engine, or a particular subclass of cars and engines, were in fact conforming during their useful lives. The

results of on-the-road testing would be particularly relevant to this inquiry.

This same proof problem, of course, would be present in the implementation of the dissent's proposal to permit the Administrator to recall cars and engines that were within their useful lives at the time of the notice of nonconformity. Under this proposal, manufacturers would be required to repair cars and engines exceeding their useful lives without any showing that the particular cars or engines had violated the emission standards during their useful lives. The dissent's proposal, to be practical, must also follow the statutory presumption that members of the recall class were nonconforming during their useful lives.

er's expense"). Given these indicia of the congressional understanding of section 207(c), and the contemporaneous administrative policy (as evidenced by manufacturers' remedial plans, *see supra* at p. 1563), it is reasonable to assume that Congress reaffirmed the EPA's understanding of its recall authority when it revisited and ratified the recall provision in 1977. There is not a shred of evidence to the contrary.[12]

Nonetheless, GM contends that one bit of legislative history contradicts the EPA's interpretation. Specifically, GM heavily relies upon one passage from the Report of the Senate Public Works Committee. In discussing a provision that was the precursor to section 207 as finally enacted, the Report said:

The Committee also recognizes the difficulty in any recall provision of notifying the owners of vehicles. The Committee expects that the manufacturer would not only depend on the files of the franchise dealer, but would, to the extent practicable, use State motor vehicle department registration files to obtain the names and addresses of subsequent purchasers of cars. By establishing a 50,000 mile, no year lifetime for the purpose of warranty, the Committee did not intend to relieve the automobile manufacturers of their responsibility to notify owners of older cars. The 50,000-mile period can be assumed to be 4 to 5 years and the manufacturer should be expected to notify any owner of a vehicle that is five years old or less as to failure to continue to perform to the standard. A decision

not to require the manufacturer to repair the vehicle could be made after notice and after finding that the vehicle had exceeded the 50,000-mile warranty period.

S.Rep. No. 1196, *supra,* at 31. GM believes that this passage constitutes a clear indication that Congress intended to limit the manufacturers' recall obligations to exclude cars and engines beyond their useful lives.

■ We disagree. In the first place, we would be very hesitant to overrule a reasonable agency interpretation, which enjoys support in the statutory language and other portions of legislative history, on the basis of a single, and rather ambiguous, passage from a committee report.[13] Furthermore, as explained below, we find that this passage in no way undermines the EPA's interpretation of section 207, because the Senate bill under consideration at the time the Committee wrote its report did not contain a recall provision similar to the provision finally embodied in section 207. Accordingly, we conclude that nothing in the legislative history runs counter to the EPA's May 30 rule.

The Senate bill did not impose upon manufacturers any recall repair obligation; it provided only for the warranty repair obligation. Section 207(d)(2) of the bill merely directed the EPA to "order the manufacturer to provide prompt notification ... [to] purchasers of all ... vehicles or vehicle engines included in the class or category" that the EPA found to be in noncompliance with emission standards. *See* S.Rep. 1196,

---

**12.** In addition, EPA's class-based interpretation of section 207 enjoys precedential support. This court, in one of the few judicial cases to construe the recall provision, observed that "[u]nlike the discovery and cure of nonconformity of individual vehicles under the warranty provisions, the remedy at this stage is recall of the *entire class* of vehicles in order to correct the design, material, or workmanship defect." *Chrysler Corp. v. EPA,* 631 F.2d 865, 868 (D.C. Cir.) (emphasis in original), *cert. denied,* 449 U.S. 1021, 101 S.Ct. 589, 66 L.Ed.2d 483 (1980).

**13.** As this court, sitting *en banc,* observed:

[I]t must be remembered that committee reports are not the law; they are only aids in interpreting statutory language and are useful only to the extent they fairly reflect congressional intent. Sometimes committee reports are not reliable guides to legislative intent, as, for example, where they contain statements that contradict the plain meaning of the statutory language or that conflict with the expressed purpose of the statute.

*Jordan v. United States Dep't of Justice,* 591 F.2d 753, 767 (D.C.Cir.1978) (en banc) (footnotes omitted).

*supra,* at 111. Once the purchaser received such a notice, he could have sought repair at the manufacturer's expense *only under the warranty* mandated by section 207(c) of the bill. *See id.* at 110. As in the final Act, the bill expressly limited the life of the warranty to the useful life of the vehicle or engine. *See id.* (section 207(c) of S. 4358); *see also* 42 U.S.C. § 7541(a) ("the manufacturer ... shall warrant ... that such vehicle or engine is ... free from defects in materials and workmanship which cause such vehicle or engine to fail to conform with applicable regulations *for its useful life*") (emphasis supplied). Thus, the Senate bill's so-called "recall" provision merely required manufacturers to *notify* purchasers of a class of vehicles of a defect, and relied on the *warranty* repair obligation—which was expressly limited in duration to the useful life of the vehicle or engine—to require the manufacturers to pay for repairs. Under this scheme, it might well have been reasonable to limit the "recall" repair obligation to include only cars and engines within their useful lives.

However, the law as finally enacted, in contrast to the Senate bill, creates an *independent* recall repair obligation in addition to the warranty obligation. Section 7541(c) of title 42 requires the manufacturer of a recalled class to submit and comply with a remedial plan for that class. Unlike the *warranty* repair obligation, which covers only failure to conform with emission standards "for [the individual vehicle or engine's] useful life," 42 U.S.C. § 7541(a), the *recall* repair obligation contains no such limitation, and can reasonably be considered to extend to all vehicles or engines in the recall class. Thus, the passage from the Senate report explains an earlier version of section 207, which is irrelevant to

the final version of the Act for the purposes of determining the scope of the recall repair obligation. We decline to overrule an otherwise reasonable agency interpretation on such an attenuated basis.

The EPA's rule also furthers the purposes of the Congress. The Clean Air Act's unequivocal directive is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). The May 30 rule obviously effectuates this purpose. When the EPA discovers a defect that results in excessive pollution in a class of cars or engines, the rule assures that the manufacturer must fashion a remedy to fit the violation: the remedial plan must include "all properly used and maintained nonconforming vehicles in the subject class regardless of their age or mileage at the time of repair." 45 Fed.Reg. 36,397 (May 30, 1980).

This interpretation makes good practical sense because, no matter what their age at the time of actual recall, nonconforming cars have been riding the roads in violation of pollution standards. Before the EPA institutes a recall, it must make a determination that the members of the recall class have generally exceeded emission standards during their useful lives. *See* 42 U.S.C. § 7541(c)(1). The agency therefore may reasonably require manufacturers to include older cars and engines in their plans to "remedy the nonconformity" of the class. Cars and engines that failed to conform with emission standards during their useful lives do not cease to be a pollution hazard thereafter; in fact, it is sensible to presume that they are more likely to be a hazard afterward than conforming cars and engines.[14] To the degree that the members of a nonconforming class can be repaired to decrease their pollution potential even after their useful lives have

---

**14.** The dissent maintains that Congress "clearly intended to avoid" the prospect that "ten-year old vehicles would be required to conform" with the emission standards. *See* Diss.Op. at 1580 & n. 40. However, such "ten-year old vehicles" are vehicles that were not in conformity with

the emission standards *during* their lives, and accordingly they should not be excluded from the recall of the class of which they are members. *See supra* at pp. 1567–1568.

Moreover, the dissent's own proposed alternative would entail the repair of "ten-year old

expired, the public is benefitted. By the same token, to the degree that they elude correction both during and beyond their useful lives, the public is cheated.[15] We therefore do not believe that older members of a recall class must be granted an exemption from plans for the remedy of a classwide defect simply because of their age or mileage at the time the recall is initiated or implemented, especially when, under such an interpretation, the number of cars and engines escaping repair could be increased as a result of manufacturer or administrative delays in getting the recall underway.[16]

vehicles." The dissent would prefer that the EPA order the manufacturer to repair only vehicles and engines that were within their useful lives at the time the EPA issues its notice of nonconformity. *See* Diss.Op. at 1580 n. 40; *id.* at 1582. Under this proposal, however, manufacturers would also be required to remedy overage cars and engines at their own expense. If the administrative process and subsequent appeals took five years or more, *as it has in this very case,* the manufacturers would be required to "remedy decade-old cars at their own expense." Diss.Op. at 1580 n. 40. How, then, can the dissent maintain that such a result is contrary to clear congressional intent?

15. The EPA explained with specificity the purposes of section 207 when it promulgated the interpretative rule and warned that those purposes could be undermined in the absence of the rule:

The recall program has two objectives: 1) To assure that manufacturers repair vehicles which are exceeding the emission standards if maintained and used and the non-conformity occurs within the useful life of the vehicles, and 2) to encourage manufacturers to build durable emission-related components to assure that vehicles will not manifest excessive emissions during their useful lives. Both of these objectives are frustrated by an interpretation of useful life which limits manufacturers' liability only to vehicles which are within their useful life at the time of repair.

45 Fed.Reg. at 36,397. As this court stressed only recently, "[w]e cannot interpret section 207 'in a manner which runs counter to the broad goals which Congress intended it to effectuate.'" *Chrysler Corp. v. EPA,* 631 F.2d at 888 (quoting *FTC v. Fred Meyer, Inc.,* 390 U.S. 341, 349, 88 S.Ct. 904, 908, 19 L.Ed.2d 1222 (1968)).

16. As the EPA emphasized when issuing the interpretative rule, "interpreting section 207(c)(1) as imposing a useful life limitation on vehicles eligible for repair under a remedial plan could severely limit the number of nonconforming vehicles repaired pursuant to recall orders, could seriously impact ambient air quality, and would frustrate the intent of Congress." 45 Fed.Reg. 36,398.

The dissent argues that the EPA could have devised an alternative administrative scheme, using its legislative rulemaking powers, to "toll" the useful life of vehicles either at the time the EPA initiates the recall or during any period of delay that could be attributed to manufacturer failure to comply in a timely manner with its statutory or regulatory obligations. *See* Diss.Op. at 1582–1583. Under such a scheme, only those cars within their useful lives at the time of the initial EPA notice of recall would be repaired at the manufacturer's expense. However, under the scheme, manufacturers could not cause attrition in the class size by engaging in dilatory tactics.

We decline to enter into the inquiry of which regulatory scheme would best balance all the interests in this field. Our task here is merely to determine whether the agency's interpretation is "sufficiently reasonable," and we conclude that it certainly is. *See FEC v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 39, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981). Regardless of whether such interpretations as the dissent suggests would be permissible—an issue we need not reach today—they are in fact not the interpretation that has been adopted by the agency. Moreover, courts should pay special deference to an agency's interpretation when, as here, (a) the agency is interpreting a statute it is charged with administering, (b) the interpretation has been consistently adhered to, (c) Congress has acquiesced to the administrative interpretation, and (d) the statute gives the agency substantial discretion in administering and designing an enforcement scheme. *See National Wildlife Fed'n v. Gorsuch,* 693 F.2d 156, 166–69 (D.C.Cir.1982).

## IV. CONCLUSION

For the reasons stated above, we hold that the EPA's May 30 rule is an interpretative rule. This rule enjoys adequate support in the language, purpose and legislative history of the Clean Air Act. GM's petitions are therefore denied.

*So ordered.*

BAZELON, Senior Circuit Judge, with whom TAMM and WILKEY, Circuit Judges, join, dissenting.

The interpretative rule upheld by the court today enjoys the virtues of simplicity,

administerability, and apparent congruence with powerfully attractive ideals of public policy.[1] Regrettably, however, it suffers from the vices of administrative over-reaching and a marked *in* congruence with the language and history of the statute it purports to interpret. Because the "principal dispute relates to the meaning of the statutory term" and "does not significantly engage the agency's expertise,"[2] and because the EPA in this case promulgated an interpretative rule with far-reaching implications for the fair administration of the Clean Air Act without sufficient statutory grounds for so doing, I am troubled by the majority's extreme deference to the EPA's actions. Therefore, I respectfully dissent.

## I. "USEFUL LIFE" AND THE LIMITS OF INTERPRETATION

### A. *The Standard of Review*

We are called upon in this case to review an *interpretative*, not a *legislative* rule.[3] The distinction between the two can be of great moment, since one of the distinguishing features of an interpretative rule is its lack of binding force upon courts; such rules are always subject to challenge in later judicial proceedings.[4] Even though courts often properly defer to an agency's interpretation of a statute for which it has been assigned enforcement responsibility, a court clearly has the power to substitute its judgment for that of the agency in the case of an interpretative rule.[5] But "neither this court nor the agency is free to ignore the plain meaning of the statute and to substitute its policy judgment for that of Congress."[6] I fear that in this instance the EPA has done precisely that.

The Supreme Court has pointed out that "[o]rdinarily, administrative interpretations are given important but not controlling significance."[7] The precise weight to be accorded an interpretative rule promulgated by an agency "in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."[8] A court must consider "such factors as the timing and consistency

1. Through the Clean Air Act, Congress sought "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population ...." Clean Air Act § 101(b)(1), 42 U.S.C. § 7401(b)(1) (Supp. V 1981) [hereinafter cited as the Act].

2. *Wilderness Soc'y v. Morton*, 479 F.2d 842, 866 (D.C.Cir.), *cert. denied*, 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973) (quoting *Barlow v. Collins*, 397 U.S. 159, 166, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970)); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

3. From the outset, as the majority notes, EPA characterized the rule as "interpretive." *See* 45 Fed.Reg. 36,396 (May 30, 1980); Majority opinion at 1565 [hereinafter cited as Maj. op.]. For the reasons cited by the majority opinion and based upon those same authorities, I agree. *Id.*

4. *See, e.g., Batterton v. Francis*, 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977) ("[A] court is not required to give effect to an interpretative regulation."); *Citizens to Save Spencer County v. EPA*, 600 F.2d 844, 876 (D.C.Cir.1979); *Joseph v. United States Civil Serv. Comm'n*, 554 F.2d 1140, 1153 n. 24, 1154 n. 26 (D.C.Cir.1977); *Gibson Wine Co. v. Snyder*, 194 F.2d 329, 331–32 (D.C.Cir.1952); *see generally* 2 K. DAVIS, ADMINISTRATIVE LAW TREATISE §§ 7:8, 7:13 (2d ed. 1979 & Supp.1982).

5. *See Batterton v. Francis*, 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977); *General Elec. Co. v. Gilbert*, 429 U.S. 125, 141–42, 97 S.Ct. 401, 410–11, 50 L.Ed.2d 343 (1976); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944); 2 K. DAVIS, *supra*, at § 7:8, 7:13.

6. *Alabama Power Co. v. Costle*, 636 F.2d 323, 365 (D.C.Cir.1979).

7. *Batterton*, 432 U.S. at 424, 97 S.Ct. at 2404.

8. *General Elec. Co.*, 429 U.S. at 142, 97 S.Ct. at 411 (quoting *Skidmore*, 323 U.S. at 140, 65 S.Ct. at 164).

of the agency's position and the nature of its expertise." [9]

The EPA rule does not "receive high marks when judged by [these] standards ...." [10] The rule was not a contemporaneous interpretation of the Clean Air Act, and there is no evidence that it reflects a long-

standing interpretation of the Act by the agency. [11] Nor, in my view, did the rule "simply restate[ ] the consistent practice of the agency in conducting recalls pursuant to section 207(c)"—a proposition upon which the majority places substantial weight. [12] Finally—and this point can scarcely be overemphasized—the interpre-

9. *Batterton,* 432 U.S. at 424 n. 9, 97 S.Ct. at 2405 n. 9.

10. *General Elec. Co.,* 429 U.S. at 143, 97 S.Ct. at 411.

11. EPA argues, and the majority agrees, that its interpretation is "longstanding." Maj. op. at 1565 n. 7. Yet, with the exception of the dispute with GM leading to the promulgation of the May 30 rule, the agency can point to only one controversy, a Chrysler recall in 1979, during which the "useful life" issue arose. *See* EPA Brief at 5 & n. 5. In that case, by EPA's own admission, the agency did not press the issue with Chrysler, because the question of nonconformity was itself being litigated. *See id.* Thus, even assuming that a lifespan barely exceeding one year suffices to render an interpretation longstanding, it would appear that the public was never placed on notice with respect to EPA's interpretation. To the extent to which the Supreme Court has required that courts scrutinize the timing of an agency's interpretative rulemaking, EPA's promulgation of the May 30 rule while in the heat of regulatory battle with GM deserves close and critical attention.

12. Maj. op. at 1565; *see also id.* at 1563; 1565 n. 7; 1570 n. 12. This conclusion lacks sufficient specific support in the record. Outside of the instant dispute, as noted *supra,* the EPA can point to only the Chrysler recall in February 1979, and there the useful life issue was conceded by the EPA. *See* EPA Brief at 5 & n. 5. Thus, in the only two specific instances in which the useful life limitations were at issue, the EPA ultimately acceded to the limitation in the Chrysler recall, choosing for the first time to contest the limitation in this present Cadillac recall.

The majority also speculates that the EPA's practice must have been consistent because the "manufacturers have not conditioned a vehicle's eligibility for recall repair ... on the basis of the vehicle's age or mileage." Maj. op. at 1565 n. 7 (citing 45 Fed.Reg. at 36,397). The record simply fails to substantiate directly that the manufacturers' behavior was the result of the imposition of the EPA's practice. The majority's speculation in fact appears to presume that manufacturers (1) somehow foresaw EPA's heretofore unannounced interpretation of their liability for repair of vehicles beyond their useful lives; (2) conceded the "reasonableness" of

EPA's position; and (3) therefore, "voluntarily" included older vehicles in their remedial plans, refraining from challenging this manifestly "reasonable" interpretation.

A more plausible explanation suggests itself. With the exception of the Chrysler and Cadillac recalls in which the useful life disputes did arise, virtually all completed emission recalls have involved vehicle classes less than three years of age at the time of owner notification of nonconformity by the manufacturer. *See* J.A. 278–96. The owner response rates drop substantially for vehicles more than four years old. *See id.* at 298. This information forms a strong basis for the inference that both the EPA and manufacturers in previous recalls have failed to raise the question of liability for repair of cars beyond their useful lives because the involvement of such vehicles in the recalls has been *de minimis.* It would not have been economical for manufacturers to have expended the resources necessary to identify those vehicles beyond their useful lives or to risk owner alienation by refusing to repair the small percentage of older cars which might have found their ways to dealerships in response to a recall. When the "six out of fifteen recalls described in detail in the record" and cited by the majority, Maj. op. at 1565 n. 7, are closely examined, this conclusion is reinforced. The percentages relied upon neglect the fact, for example, that the recalls of 1975 and 1976 Pontiacs, 1975 Fords, and 1974 AMCs involved vehicles that were part of a much larger (and younger) recall class; that the AMC recall was complicated by the more stringent emissions standards applicable uniquely to vehicles sold in California; that the manufacturers included older vehicles voluntarily; that owner responses to recalls drop dramatically with the age of the vehicle; and that the idiosyncracies of particular recalls and of negotiations between EPA and manufacturers on a case-by-case basis render the statistics relied upon by the majority unrepresentative and misleading. *See* J.A. at 278–96.

For example, the majority writes that "in 1978 the EPA began a recall that included 1974 AMC cars sold in California, approximately *56%* of which were beyond their useful lives." Maj. op. at 1565 n. 7 (emphasis in original). A close look at the facts of that recall, however, is illuminating. EPA ordered the recall of all 1976 AMC cars in May 1978. At that point, the model was approximately two-and-a-half years old and fewer than 20% of the vehicles could have been

tative rule at issue in this case does not involve the kind of fact-intensive questions concerning which great deference need be given the agency's technical expertise; rather, as the agency itself concedes. "[s]ince the rule simply expresses an interpretation of the law based on the language, legislative history and policy of the Clean Air Act, no factual data need be analyzed or commented on." [13] Consequently, although some deference is to be accorded the May 30 rule, our inquiry must focus on whether EPA's interpretation is reasonable and supportable in light of the statutory language and legislative history. And our final determination should reflect, if required by that language and history, the Supreme Court's reminder that "[a] court is not required to give effect to an interpretative regulation." [14]

expected to have exceeded their useful lives. We are told that AMC "indicate[d] it [would] include 1974, 1975, and 1976 AMC cars sold in California in its plan." J.A. 291. The exact motive for this inclusion is not disclosed by the record, but it is clear that AMC included these vehicles voluntarily, perhaps out of a concern for their ability to meet more stringent California state emissions requirements. However, the majority points to the 1974 AMCs included in this recall as evidence of a class involving large numbers of cars beyond their useful lives for which the manufacturers did not impose a five year or 50,000 mile limitation. I would suggest, with respect, that such use of data is inappropriate because (1) only *California* vehicles from the 1974 and 1975 AMC model-years were included in the recall, thus making them a relatively small proportion of the recall class which was overwhelmingly composed of 1976 AMCs, and (2) these vehicles were included *voluntarily,* thus indicating the manufacturer's willingness to go beyond EPA's requirements.

The majority's reliance upon a few other recalls involving some percentage of olders cars is similarly misplaced, but no constructive purpose would be served by here disputing the numbers offered by the majority or by enumerating the special circumstances involved in each case. The fact remains that nine of the fifteen recalls involved no older vehicles, J.A. at 278–96, and that only the Chrysler and Cadillac recalls meaningfully presented the useful life issue, an issue which, in the Chrysler case, was not pursued by EPA. *See supra* note 11. Such a history hardly "constitutes a longstanding administrative policy." Maj. op. at 1565 n. 7.

Judicial deference to an agency's "consistent" interpretation should not be based on the fact

### B. *Statutory Language*

In reviewing an agency's interpretation of a statute, a court should first examine the language of that statute to determine whether the interpretation falls within the statute's plain meaning. [15] Section 207(c) of the Clean Air Act reads in relevant part as follows:

If the Administrator determines that a substantial number of any class or category of vehicles or engines, although properly maintained and used, do not conform to the regulations prescribed under section 7521 of this title [emissions standards] when in actual use throughout their useful life (as determined under section 7521(d) of this title), he shall immediately notify the manufacturer thereof of such nonconformity, and he shall require the manufacturer to submit a

that the issue at stake simply has not previously arisen. Such deference is appropriate if an administrative interpretation has been consistently asserted in the face of a long series of challenges, *see, e.g., Esquire, Inc. v. Ringer,* 591 F.2d 796, 801 (D.C.Cir.1978), or if the policy had been publicly announced and implemented for a long time, *see, e.g., DeLano v. United States,* 183 Ct.Cl. 379, 393 F.2d 517, 521–22 (1968). In the instant case, however, the EPA has previously announced its position only once and, in that instance, "did not proceed" on behalf of that position. EPA Brief at 5 n. 5. We are pointed to no other occasion on which the EPA *affirmatively required* manufacturers to include vehicles beyond their useful lives in their remedial plans; the issue simply was never raised by either party.

13. EPA Brief at 41.

14. *Batterton,* 432 U.S. at 425 n. 9, 97 S.Ct. at 2405 n. 9.

15. *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979); *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917); *Symons v. Chrysler Corp. Loan Guarantee Bd.,* 670 F.2d 238, 241 (D.C.Cir. 1981); *Higgins v. Marshall,* 584 F.2d 1035, 1037 (D.C.Cir.1978), *cert. denied,* 441 U.S. 931, 99 S.Ct. 2051, 60 L.Ed.2d 659 (1979).

plan for remedying the nonconformity of the vehicles or engines with respect to which such notification is given. The plan shall provide that the nonconformity of any such vehicles or engines which are properly used and maintained will be remedied at the expense of the manufacturer.[16]

The majority relies upon "this class-based orientation of section 207(c)(1)" in concluding that "the EPA reasonably mandated that remedial plans be designed to cover all members of a recall class," regardless of the age or mileage of any individual vehicle at the time it is brought in for repair, "if (1) a substantial number of cars within a given class exhibited nonconformity during their useful lives, and (2) the car is a member of that class."[17] GM focuses instead upon the concept of nonconformity, arguing essentially that although classes of vehicles can be recalled, and remedial plans can be prepared on a class-wide basis, a manufacturer can be liable to "remedy" only those nonconforming members of a recall class that are within their useful lives at the time of repair.[18] Each of these approaches to the statute has a superficial appeal, but neither

constitutes a "sufficiently reasonable" interpretation of the legislation to which this court must look for guidance.[19]

To some extent, of course, the plain language of a statute and the legislative history which resulted in that language are inextricable;[20] but even a casual reader of the Clean Air Act's text, without reference to legislative intent, could not help but be struck by the significance of the concept of "useful life." At the outset, the Act makes clear that emissions standards prescribed by the Administrator are applicable to the vehicles throughout their "useful lives."[21] It explicitly defines the useful life of automobiles as "a period of use of five years or fifty thousand miles (or the equivalent), whichever first occurs ...."[22] In the recall and remedy provision at the heart of the instant controversy, the statute not only refers to "useful life" but directs readers to the statutory definition of the term by section number.[23] Moreover, without resort to the term or definition, the Act utilizes the five year or fifty thousand mile "useful life" concept in no fewer than four different statutory enforcement provisions.[24] To interpret section 207(c) in such a way as to eliminate, for all practical

---

**16.** *As amended,* 42 U.S.C. § 7541(c)(1) (Supp. V 1981).

**17.** Maj. op. at 1567.

**18.** GM Brief at 20, 23–26; Petitioner's Supplemental Brief on Rehearing En Banc, April 12, 1984 at 5 [hereinafter cited as GM Supp. Br.] ("Because no emissions standard applies to a vehicle beyond 5 years or 50,000 miles, there can be no nonconformity which the manufacturer can be required to remedy under § 207(c)(1)."); *see* Maj. op. at 1567.

**19.** *See FEC v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981).

**20.** The legislative history is explored *infra* pp. 1577–1581.

**21.** 42 U.S.C. § 7521(a)(1) (Supp. V 1981).

**22.** 42 U.S.C. § 7521(d)(1) (Supp. V 1981).

**23.** 42 U.S.C. § 7521(c)(1) (Supp. V 1981); *see supra* note 16 and accompanying text.

**24.** For example:

1. Section 206(a) requires EPA to certify, on the basis of extensive testing of prototypes, that each new vehicle produced will conform to emissions standards for five years or 50,000 miles. No manufacturer may produce or market vehicles not covered by such a certificate. 42 U.S.C. § 7525(a) (Supp. V 1981).

2. Section 206(b) authorizes the EPA to conduct production line testing to determine whether vehicles being manufactured will conform to emissions standards for 50,000 miles. Suspension of the certificate of conformity is authorized if vehicles fail such tests. 42 U.S.C. § 7525(b) (Supp. V 1981).

3. Section 207(a) requires a manufacturer to warrant that each vehicle sold is designed and built to conform to emissions standards and that its materials and workmanship are free from any defect which will cause it to fail to conform to emissions standards during its useful life. 42 U.S.C. § 7541(a) (Supp. V 1981).

4. Section 207(b) further requires a manufacturer to warrant that performance of major emissions components of each vehicle will conform to emissions standards for five years or

purposes, any "useful life" limitation on the EPA's authority to require manufacturers to remedy nonconforming vehicles, would be manifestly unreasonable, an evident attempt to circumvent the plain meaning of the statutory language. Yet, it is precisely such an interpretation that the majority today condones, emphasizing that the question presented by this case "is not settled by the definition of 'useful life'; it turns on the intended scope and purpose of the recall provision." [25]

But if defining the concept of "useful life" cannot *settle* this question, neither will minimizing that concept's obvious importance contribute to the correct resolution of this case. Indeed, it is likely that the "intended scope and purpose of the recall provision" can only be arrived at and fully appreciated by attempting to define, understand, and reasonably apply that critical statutory term. A good place to begin is with the argument urged upon this court by GM, the bulk of which the majority properly rejects.

In asserting that "the statute does not authorize EPA to order recall and repair of vehicles beyond their useful lives, ignoring their age and mileage at the time of repair," [26] GM confusingly intermingles the EPA's authority "to order recall and repair" of vehicles with its own duty to perform any necessary repair, implying that the time and mileage parameters of "useful life" are somehow to be applied "at the

time of repair." There is no support for such an interpretation in the statutory language. Indeed, that language suggests, if anything, that the definition of useful life applies when "the Administrator determines" that a nonconformity exists and notifies the manufacturer "immediately." [27] In addition, to accept GM's interpretation would be, in practice, to undercut the central point of section 207(c), even as to accept EPA's and the majority's interpretation would be to destroy its explicitly delineated outer boundaries. If the nonconformity of a class of vehicles were discovered relatively late in a vehicle's useful life, or if protracted negotiations, litigation, and appeals combined to place all or most vehicles involved in a recall beyond their useful lives by the time members of the recall class were brought in for necessary service, GM's interpretation could regularly, even totally, frustrate the purpose of the recall provision. On the other hand, the interpretation offered by the EPA and accepted by the majority flies just as surely in the face of the statute's plain meaning and similarly frustrates the intent of Congress. Somewhere between these two extreme readings of the statutory language, the path of reasonableness lies.

### C. *The Legislative History*

Even where, as here, the statutory language appears clear, the plain meaning rule is only a primary and not a conclusive

---

50,000 miles. 42 U.S.C. § 7541(b) (Supp. V 1981).

**25.** Maj. op. at 1568.

**26.** GM Supp. Br. at 5.

**27.** GM essentially ignores the language of section 207(c) itself, which plainly invokes the "useful life" concept in connection with the EPA's pre-notice determination of nonconformity. The company argues instead that vehicles beyond their useful lives when brought in for repair cannot be, at that time, "nonconforming," since emissions standards can only apply to vehicles during their useful lives. GM Brief at 19–20, 23–26. If accepted as a reasonable interpretation of the statute, EPA would be required, before issuing a notice of nonconformity to a

manufacturer, to estimate and take into account potentially long lag times between that notice and the date that the entire class of vehicles would be brought in for inspection and repair. In practical administrative terms, the five year element of "useful life" might mean 4½ years in some cases, two years or less in others. Section 207(c) would become an uncertain and inconsistent mechanism at best, a nullity at worst. Reading the statute, instead, to mean what it plainly seems to mean—*i.e.*, that a manufacturer must recall and repair vehicles that are within their useful lives at the time that the agency's notice of nonconformity first issues—would be at once administerable and reasonable. *See infra* pp. 1582–1583.

source of understanding and must yield on occasion to other indicia of legislative intent, including legislative history.[28] The majority rightly looks to such history for guidance, but looks, I believe, in the wrong places and with the wrong emphasis. The crucial point to be made about the recall provision is not that Congress intended it to apply to a "model" or "class" or "category" of vehicles or engines, but that it intended any delineation of a "given model run" or an "entire lot" to depend upon its deliberately created concept of "useful life." [29]

If little else is crystal clear from the complex legislative history of the Clean Air Act, one thing is: despite evidence that the actual life of an automobile is closer to ten years or one hundred thousand miles than it is to five years or fifty thousand miles, Congress *intentionally limited* the duration of a manufacturer's *liability* for a vehicle's nonconformity with emissions standards to a five-year/fifty-thousand mile period. For example, Senator Muskie, one of the bill's prime sponsors, remarked that "[f]ifty thousand miles is not all their life, 100,000 miles being nearer to a measure of the life of a motor vehicle, but we have taken 50,000 miles." [30] During the debate on the 1977 Clean Air Act Amendments, Senator Muskie reemphasized this conscious choice:

The actual life of a car is more than 50,000 miles. We all know that. It approaches 100,000 miles, I think, increasingly, but it was our feeling that a 50,000-mile warranty would put sufficient pressure on the manufacturers to meet the standards so that if they met them for 50,000 miles, the chances were that the standards would be met pretty closely ... even ... beyond 50,000 miles.[31]

The considerations underlying the "useful life" limitations were equally straightforward. As the Senate Committee Report noted in 1970:

The manufacturers informed the Committee that they would not be able to guarantee conformity with emissions standards for the anticipated 10-year life of a vehicle. The committee bill provides that 50,000 miles would be the maximum that a vehicle would be required to conform to the standards for which it was certified.[32]

Where Congress has so explicitly and deliberately considered, and then rejected, a more expansive requirement than that ultimately enacted, it is not for the agency to exceed the statutory limits under the guise of "interpretation." [33]

Nevertheless, the majority argues at considerable length that some of the 1970 legislative history is "irrelevant" because

---

**28.** *See Chesapeake & Ohio Ry. Co. v. United States,* 571 F.2d 1190, 1194 (D.C.Cir.1977); *see also Watt v. Alaska,* 451 U.S. 259, 266 & n. 9, 101 S.Ct. 1673, 1678 & n. 9, 68 L.Ed.2d 80 (1981); *Aaron v. SEC,* 446 U.S. 680, 705–08, 100 S.Ct. 1945, 1960–61, 64 L.Ed.2d 611 (1980) (Blackmun, J., concurring in part and dissenting in part).

**29.** The majority devotes much effort to establishing that recalls must be class-wide, but sheds no light on the role of "useful life" in defining the "class" to be recalled. *See* Maj. op. at 1567–1568.

**30.** 116 Cong.Rec. 33,094 (1970), *reprinted in* 1 Senate Comm. on Pub. Works, 93rd Cong., 2d Sess., A Legislative History of the Clean Air Amendments of 1970, at 430 (1974) [hereinafter cited as *1970 Legislative History*].

**31.** 122 Cong.Rec. 24,302 (1976), *reprinted in* 6 Senate Comm. on Environment & Pub. Works, 95th

Cong., 2d Sess., A Legislative History of the Clean Air Amendments of 1977, at 5145 (1978).

**32.** S.Rep. No. 1196, 91st Cong., 2d Sess. 30 (1970), *reprinted in* 1 *1970 Legislative History, supra* note 30, at 430.

**33.** The Supreme Court has recently reaffirmed that "[w]hen a court reviews an agency's construction of the statute which it administers, ... the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." This is so because "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent .... If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron U.S.A. v. Natural Res. Ref. Council,* —— U.S. ——, —— & n. 9, 104 S.Ct. 2778, 2782 & n. 9, 81 L.Ed.2d 694 (1984).

the law as finally enacted, in contrast to the Senate bill, creates an *independent* recall repair obligation in addition to the warranty obligation. Section 7541(c) of title 42 requires the manufacturer of a recalled class to submit and comply with a remedial plan for that class. Unlike the *warranty* repair obligation, which covers only failure to conform with emission standards "for [the individual vehicle or engine's] useful life," 42 U.S.C. § 7541(a), the *recall* repair obligation contains no such limitation, and can reasonably be considered to extend to all vehicles or engines in the recall class.[34]

With respect, such exertions in response to GM's reliance upon a particular passage from a committee report hardly seems worth the candle.[35] Ultimately, the majority's dismissal of the Senate Committee Report rests on the dubious assumption that the Conference Committee, without comment or explanation, added to the recall provision of the Senate bill an "independent" recall repair obligation in addition to the warranty obligation. Any such new recall repair obligation, however, would expose the manufacturer to liability for repair virtually indefinitely, in dramatic (and unexplained) contrast to the warranty repair obligation, which limited the manufacturer's liability for repair to a vehicle's useful life. Unlike the majority, I do not see, try as I might, how the recall repair obligation "can reasonably be extended" so far.[36]

To appreciate how *un*reasonable such an interpretation would be, it is important to bear in mind that a recall class may include vehicles or engines of more than one model year. For example, the same carburetor or engine component may be used in vehicles over the course of four or five model years.[37] Under the interpretation espoused by EPA and the majority, the manufacturer would be liable for the repair of all vehicles ever produced with that component, provided a sample of defective vehicles or engines still within their useful lives could be assembled for testing.[38] If the processes of the initial EPA investigation and of approving a remedial plan were to require as much time as they did in the present case, that liability would be extended even further.[39] And taking the process of owner notification into account, compounded not infrequently by appeals to the

34. Maj. op. at 1571 (emphasis in original).

35. *See* Maj. op. at 1570. I do not find this particular passage either as ambiguous as the majority appears to believe or as dispositive as GM claims on the issue of congressional intent. Most importantly, I find it completely consistent with "the plain meaning of the statutory language" and "the expressed purpose of the statute" insofar as it reinforces the evident desire of Congress to place some reasonable limitation upon the liability of manufacturers. *See id.* at 1568 n. 10; *Jordan v. Department of Justice*, 591 F.2d 753, 767 (D.C.Cir.1978) (en banc) (footnotes omitted).

36. At one point the majority appears to modify its own "classwide" analysis, arguing that "[t]here is, at the very least, this definite time limitation on the Administrator: he must conclude his testing before the entire recall class has exceeded five years of age." Maj. op. at 1568 n. 9. While I agree that this would be a slightly more reasonable interpretation of the EPA's statutory authority, it is not the authority asserted by the EPA in this case, and no hint of such a limitation is contained in the plain language of the interpretative rule, the validity of which is

here at issue. Additionally, it does not avoid the unreasonable result illustrated *infra* notes 37–41 and accompanying text.

37. *See, e.g.,* J.A. 293 (recall of 1975–1978 Pontiacs with EGR back pressure transducers).

38. Thus, if the Pontiac engine defect, *supra,* for instance, had been discovered during the fourth year of the useful lives of the 1978 model Pontiacs, *all* Pontiacs manufactured with the suspect transducer would be subject to recall. The manufacturer would have been required to repair not only the four-year old 1978 but also the 1975 Pontiacs, which, at the time the EPA would have issued its notification of nonconformity, would have been between nine and ten years old.

39. Months may be consumed in testing and investigating a potentially nonconforming class prior to the issuance of a recall order. EPA approximates the average time spent in such investigations as nine months. *See* J.A. 268 & n. 5. In this case the EPA investigation began in May 1975, issued its notice of nonconformity in March 1977, and negotiated the details of GM's remedial plan through December 1979. *See* J.A.

## 1580

agency or the courts, manufacturers could and certainly would be compelled to remedy at their own expense the "nonconformity" of vehicles that were more than a decade old.[40] The emissions standards to which those ten-year old vehicles would be required to conform, moreover, would be standards that Congress explicitly intended to apply exclusively to vehicles half that age or younger.[41]

One would have expected such a drastic extension of the manufacturer's repair obli-

gation to have attracted at least some debate. Certainly there were those in the Senate who believed even the limited five-year liability imposed by the warranty provision to have been excessive.[42] Particularly in the House, where the original bill to amend the Clean Air Act contained neither a recall nor a warranty repair obligation, some comment on such a sweeping new imposition of repair liability would surely have arisen.[43] Yet, no such comment was made during either the House or the Senate debates on the Conference Committee

1, 123, 137, 142, 145, 170, 182, 203, 224, 226, 230, 236, 247, 252.

**40.** EPA estimates that the "average time from recall order to owner notification is 8½ months." EPA Brief at 28 n. 33; J.A. 268 & n. 6. As to appeals, EPA found "the recall of certain 1975 Chryslers ordered recalled on December 8, 1976" to be "[o]f particular note":

Although the recall was ordered relatively early in the life of the vehicles, Chrysler requested an administrative hearing on the Administrator's determination of nonconformity. The Administrative Law Judge upheld the determination in a decision filed on February 10, 1978. Subsequent appeals to the Administrator and this Court also resulted in decisions favorable to EPA. *Chrysler Corp. v. EPA,* [631 F.2d 865 (D.C.Cir.1980) ] .... Certiorari was denied by the U.S. Supreme Court on December 1, 1980 ..., when few, if any, of the 208,000 vehicles subject to the recall order were still within their useful lives.

EPA Brief at 28 n. 35.

**41.** If the EPA and this court had interpreted the statute to require the manufacturer to recall and bring into conformity with "useful life" standards all cars which were within their useful lives *at the time the notice of nonconformity issued* to manufacturers, or even on the date the manufacturer and EPA agreed on an appropriate remedial plan, that interpretation would, I believe, have been a reasonable one. This is so even though, as developed *infra* note 58 and accompanying text, such an interpretation might require *some* vehicles to be brought into conformity with such standards despite their having exceeded their useful lives *at the time of repair.* By limiting, *ab initio,* the recall authority to the class of vehicles within their useful lives at the time the nonconformity is first established by the agency and communicated to the manufacturer, the agency would have been acting, in my opinion, within its reasonable discretion under the statute. *See infra* pp. 1582–1583.

Taken on its face, however, the EPA rule simply goes too far, and does raise the specter

of a manufacturer being required to remedy decade-old cars at its own expense, a result that Congress clearly intended to avoid. The EPA attempted at oral argument to salvage the rule from this conspicuous defect by asserting that the agency will not in fact require such vehicles to be brought into compliance with inapplicable standards but will instead require the same "repair" to be made on older and younger vehicles. The difficulty with this approach is that the Act requires not that a "repair" be performed but that a nonconformity be remedied.

Similarly, the majority's attempt to save this interpretative rule by reading a modest limitation into its facially limitless language, Maj. op. at 1568 n. 9, ought to be unavailing. Even if the recall action in this case can and should be upheld, *see infra* at p. 1584, the rule itself, as promulgated, is clearly and unambiguously contrary to the statute's language and history.

Under our cases, if the agency wishes to fill in interstices created by a possible congressional failure to anticipate all the possible consequences of the statutory scheme, the proper recourse is a legislative, not an interpretative rule. *See Chamber of Commerce v. OSHA,* 636 F.2d 464, 469–70 (D.C.Cir.1980).

**42.** *See, e.g.,* 116 Cong.Rec. 33,083, 33,093 (1970), *reprinted in* 1 *1970 Legislative History, supra* note 29, at 307–08, 330–31 (remarks of Senator Griffin); *id.* at 33,097, *reprinted in* 1 *1970 Legislative History, supra* note 29 at 338 (remarks of Senator Cooper); *see also* Administration's Letter to Conference Committee Recommending Certain Provisions (Nov. 17, 1970), *reprinted in* 1 *1970 Legislative History, supra* note 29, at 212–13 (expressing view of executive branch that 50,000-mile warranty was "inappropriate and unrealistic in the light of known technology and experience").

**43.** *See* H.R. Rep. No. 1146, 91st Cong., 2d Sess. 11–13, 38–40 (1970), U.S.Code Cong. & Admin. News 1970, p. 5356.

Report; instead, the only discussion of amendments to § 207 of the Act focused exclusively on the House's acquiesence in the Senate's proposed *warranty* repair obligation, which as the majority admits, was limited to the five-year/50,000-mile useful life of the recalled vehicle.[44]

My own reading of the legislative history leads me to conclude that any alterations made in the Senate bill by the Conference Committee were merely "technical, clarifying, and conforming changes,"[45] and that the warranty repair obligation and the recall repair obligation are essentially coterminous.[46] Although they do differ in their triggering agents—the individual consumer in the case of warranty repairs or the agency in the case of recalls—both obligations are limited in duration to the five years or 50,000 miles of a vehicle's useful life.

If this reading of the legislative history (and, as demonstrated earlier, of the plain meaning of the statutory language with which the history is thoroughly consistent, is correct, just one task remains: the determination of the precise point in the recall process at which the all-important "useful life" limitation should apply. That determination, of course, is for the agency, so long as its action is "sufficiently reasonable."[47]

In this case, the majority concludes that "it certainly is."[48] Reluctantly, as sympathetic as I am with the EPA's chafing at the bit of its statutory authority in promulgating the instant rule, I cannot agree.[49]

## II. THE REASONABLENESS INQUIRY

### A. *The Language of the May 30 Rule and its Implications*

By requiring "manufacturers to submit a plan to remedy all vehicles within the class or category of vehicles subject to an ordered recall which experienced the nonconformity during their useful lives regardless of their age or mileage at the time of repair,"[50] the agency did at least use the *words* "useful life." But it did so in such a way as, in practice, to read the useful life limitation out of the statute. As the foregoing discussion has demonstrated, Congress clearly contemplated some increase in a car's emissions once a vehicle has surpassed its useful life. Correspondingly, and just as clearly, Congress provided for a limitation on a manufacturer's obligation to recall and repair nonconforming cars that had exceeded their useful lives. The question presented by this case is thus whether, as the majority asserts, the recall repair obligation "can reasonably be considered to extend to all vehicles or engines in the

---

**44.** *See* 116 CONG.REC. 42,520 (1970), *reprinted in* 1 *1970 Legislative History, supra* note 29, at 112 (House debate) (remarks of Representative Staggers); *id.* at 42,382, 42,385, *reprinted in* 1 *1970 Legislative History, supra* note 29, at 126, 134–35 (Senate debate) (remarks of Senator Muskie).

**45.** H.R. REP. No. 1783, 91st Cong., 2d Sess. 42 (1970), U.S.Code Cong. & Admin.News 1970, pp. 5356, 5374, *reprinted in* 1 *1970 Legislative History, supra* note 29, at 192. No mention of any extension of a manufacturer's liability for repair of nonconforming vehicles beyond the five-year/50,000-mile limits of the warranty period is made anywhere in the Conference Committee Report.

**46.** As the Supreme Court has recently reaffirmed in another context: "Had Congress intended so fundamental a distinction, it would have expressed that intent clearly in the statutory language or the legislative history." *Securities Indus. Ass'n v. Board of Governors of the Fed. Reserve Sys.,* — U.S. —, —, 104 S.Ct.

2979, 2988, 82 L.Ed.2d 107 (1984) (quoting *American Tobacco Co. v. Patterson,* 456 U.S. 63, 72 n. 6, 102 S.Ct. 1534, 1539 n. 6, 71 L.Ed.2d 748 (1982)).

**47.** *FEC v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981).

**48.** Maj. op. at 1572 n. 16.

**49.** Nor can I agree, as noted *supra* p. 1577, with the interpretation of the recall provision offered by GM. As this opinion goes on to suggest, EPA's enforcement authority need not be constrained significantly, if at all, by my reading of the Clean Air Act's recall provisions. *See infra* pp. 1582–1584.

**50.** 45 Fed.Reg. 36,396–97 (May 30, 1980) (presently codified at 40 C.F.R. § 85.1803, App. A to subpart S (1982)).

recall class"[51] which, in the language of the rule, "experienced the nonconformity during their useful lives." To my mind, what is unreasonable about the EPA rule is not that some vehicles may be compulsorily repaired at a manufacturer's expense "regardless of their age or mileage at the time of repair" (GM's position), but that in many cases a manufacturer will be unable reasonably to determine whether a particular vehicle became noncomplying during its useful life or long after.[52]

Under the May 30 rule as promulgated, whenever a car brought in for repair has exceeded its useful life, the manufacturer will be unable to demonstrate whether a present emissions excess is attributable to the sanctioned erosion of performance after 5 years or 50,000 miles, which Congress so clearly acknowledged as likely and explicitly provided for through the concept of useful life, or to a nonconformity which did in fact exist *during* the vehicle's useful life.[53] In essence, the EPA's rule establishes an absolute and irrebuttable presumption that *all* older cars were among the percentage failing to meet standards during their useful lives. In practice, the language of the statute—"If the Administrator determines that a substantial number ... do not conform"—would be rewritten to read "did not conform" or "might not have conformed." Even if the establishment of such a presumption or the enforcement of such a construction were within the EPA's authority, such actions go be-

yond mere statutory interpretation. Even if, as the majority suggests, the May 30 rule "makes good practical sense" and is "sensible" in light of the Clean Air Act's purpose, its evident disparity with the plain meaning of the statutory language and legislative history would seem to require, at a minimum, legislative rulemaking with attendant notice and comment procedures.[54]

### B. *Some Reasonable Alternatives*

In concluding that the agency acted unreasonably in promulgating its May 30 interpretative rule, I wish to emphasize that the interpretation urged upon this court by GM seems to me at least equally unreasonable,[55] and that EPA could, in my view, readily remedy the defect by one of three alternative approaches.[56]

First, EPA might reword its interpretative rule in such a way as to *reasonably* interpret the language and history of the recall provision. If, for example, the rule were to provide for the recall and repair of vehicles within their useful lives *at the time the notice of nonconformity issued to manufacturers*, the intent of Congress would be vindicated, and manufacturers would have little or no incentive to delay a valid recall by means of strategic lawyering. Quite to the contrary, any frivolous or bad-faith delay would be penalized not only by its inherent expense but by the fact that any nonconforming vehicles ultimately requiring repair would be older and, pre-

---

51. Maj. op. at 1571.

52. *See supra* pp. 1579–1580.

53. At best, manufacturers would be forced to indulge in expensive, unwieldy, customer-alienating, fact-specific controversies concerning when a given car, beyond its useful life when presented for repair, first exhibited excessive emissions.

54. Maj. op. at 1571.

55. *See supra* p. 1577.

56. The majority has, in a sense, suggested a fourth. *See supra* note 36; Maj. op. at 1568 n. 9.

In so doing, however, the majority opinion insists that "it is not the job of the courts to propose rules that they would prefer the agency to adopt." Maj. op. at 1567 n. 8. That is true, of course, but it is equally true, and this court has recently reemphasized, that where the adoption of a particular rule is beyond the agency's statutory authority, it is our obligation to vacate the rule in question. *Cf. Union of Concerned Scientists v. Nuclear Regulatory Comm'n*, 735 F.2d 1437, 1451 (D.C.Cir.1984) (Wald, J.) (little deference accorded agency's interpretation of procedural requirements, normally the area in which an agency deserves the most deference, because "Congress did not grant the Commission discretion to remove so material an issue ....").

sumably, more expensive to bring into conformity with emissions standards.

The reasonableness of such an interpretative rule would be underscored by an important passage of the Act's legislative history. The comments of the House managers of the 1970 bill, included in the Conference Committee Report, explicitly state:

> The Senate [bill] ... authorized the Administrator, if he determined that any class or category of vehicles or engines did not conform with applicable emission standards, to require manufacturers to notify purchasers of such nonconformity. *Moreover, if a manufacturer discovered such nonconformity during the term of any warranty* required under the Senate [bill], he was required to notify purchasers of the nonconformity and to remedy such nonconformity at no cost to the owner.[57]

Even as to the warranty provision, then, and *a fortiori* as to the recall provision (if, as the majority believes, there is any distinction between the two), Congress contemplated that the notion of "useful life" was to be applied at the time the manufacturer became aware of a nonconformity.[58]

A second alternative open to the agency, as noted, would be a full legislative rulemaking. If, after hearing all sides and making a record, the agency believed that the language of its May 30 rule remained justifiable, it would be sustained on judicial review unless it were found to be "arbitrary, capricious, or manifestly contrary to

the statute."[59] Any rule promulgated in the wake of such full procedural safeguards would, of course, be entitled to more weight than the interpretative rule to which the majority—inappropriately, I believe—today defers.

In this context I would note, as well, that the Administrator has substantial discretion in defining by regulation the useful lives of vehicles under the Act. Section 202(d) defines the useful lives of "light duty vehicles" as "a period of use of five years or fifty thousand miles (or the equivalent), whichever first occurs ...."[60] The parenthetical phrase, "or the equivalent," surely authorizes the Administrator to establish, in essence, a "constructive useful life," by promulgating legislative regulations prescribing *how* the five-year/50,000 mile useful life will be measured for recall purposes. For example, a vehicle's age and mileage could be "tolled" whenever the EPA issues a recall order for vehicles of its class. Such a tolling provision would protect the recall system from manufacturer-induced delays. The majority acknowledges this possibility but "decline[s] to enter into the inquiry of which regulatory scheme would best balance all the interests on this field."[61] I agree that it is the role of the agency, and not of the courts, to make such a determination. But it *is* the role of the courts to "reject administrative constructions which are contrary to clear congressional intent."[62] Especially where, as here, an agency promulgates an interpretative, rather than a legislative, rule,

57. H. Rep. No. 1783, 91st Cong., 2d Sess. 50 (1970), *reprinted in* 1 *1970 Legislative History, supra* note 30, at 200 (emphasis added).

58. If, as suggested here, the manufacturer's obligation to recall and repair a nonconforming vehicle attaches at the time the agency makes a determination of nonconformity and gives notice, some cars may be beyond their useful lives by the time they are repaired. If a particular vehicle's status at the time of the determination were contested, however, its age could be easily ascertained by reference to the bill of sale, and its mileage could be rebuttably presumed to have increased uniformly throughout its period of ownership. Such a presumption would need

to be resorted to only rarely, and would be reasonable under the circumstances.

59. *Chevron U.S.A. v. Natural Res. Def. Council,* — U.S. ——, ——, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

60. 42 U.S.C. § 7521(d)(1) (Supp. V 1981).

61. Maj. op. at 1572 n. 16.

62. *Chevron,* —— U.S. at —— n. 9, 104 S.Ct. at 2782 n. 9.

**1584**

and where it relies not on its technical expertise but on statutory interpretation alone, the Supreme Court has made it abundantly "clear ... that deference is not to be a device that emasculates the significance of judicial review." [63]

Finally, of course, the EPA and other advocates of a more far-reaching recall authority than that provided by Congress in the Act as amended may seek fresh congressional attention to the issues raised by this case. A more reasonable interpretative rule, crafted along the lines suggested in this opinion, may be deemed inadequate; similarly, the alternative of legislative rule-making may prove somehow unsatisfactory. If so, those who would impose a more far-reaching burden upon automobile manufacturers to ensure the purity of our nation's air will have recourse to our nation's legislators. It may well be desirable to hold manufacturers liable to recall and repair every vehicle ever produced that may have violated emissions standards many years before in order "to compensate for the pollution caused during the time of its violation." [64] I fear, however, that in this case the majority has forgotten that

"[i]t is not for an administrative agency ... to preempt congressional action or to 'fill in' where it believes some federal action is needed." [65]

### III. CONCLUSION

For the reasons discussed in this opinion, I would vacate EPA's May 30, 1980 interpretative rule. I would affirm, however, that part of the June 23, 1980 order finding that GM had failed to submit a satisfactory remedial plan with respect to certain 1975 Cadillacs within their useful lives as of March 21, 1977, the date on which the Administrator officially notified GM of the nonconformity of a substantial number of those vehicles.

---

**63.** *Securities Indus. Ass'n v. Board of Governors of the Fed. Reserve Sys.,* — U.S. —, —, 104 S.Ct. 2979, 2983, 82 L.Ed.2d 107 (1984).

**64.** Maj. op. at 1568.

**65.** *Office of Consumers' Counsel v. Federal Energy Regulatory Comm'n,* 655 F.2d 1132, 1152 (D.C.Cir.1980).