**ASSOCIATION FOR REGULATORY REFORM, Plaintiff,**

**v.**

**Samuel PIERCE, et al., Defendants.**

**Civ. A. No. 86–3462–OG.**

United States District Court,
District of Columbia.

July 20, 1987.

As Modified July 28, 1987.

Edward F. Canfield and S. Churchill Elmore, Washington, D.C., for plaintiff.

John C. Martin, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM

GASCH, District Judge.

### I. INTRODUCTION

Plaintiff Association for Regulatory Reform ("ARR"), an association of manufacturers of mobile homes ("manufactured homes"), brings suit against defendants, the United States Department of Housing and Urban Development ("HUD" or "the agency"); HUD's Secretary, Samuel Pierce; and the Director of HUD's Manufactured Housing and Construction Standards Division, William Sorrentino.[1] The plaintiff charges that HUD improperly modified its definition of a manufactured home as defined by the National Manufactured Housing Construction and Safety Standards Act of 1974 ("the Manufactured Housing Act" or "the Act").[2] The ARR charges that HUD failed to employ the required rulemaking procedures to effect the change and that the agency's definition is arbitrary and capricious. The ARR complains that HUD's definition overturns long-standing agency practice and will severely injure, if not cripple, the manufactured housing industry. Accordingly, the ARR seeks a declaration that HUD's definition of a manufactured home is erroneous and a permanent injunction preventing implementation of the agency's definition. The defendants have moved to dismiss the case for lack of jurisdiction or, in the alternative, for summary judgment.[3]

---

1. Unless specifically named, the defendants will collectively be referred to as HUD.

2. The Manufactured Housing Act provides standards to govern the production of manufactured homes. Where applicable, it preempts state and local building regulations. 42 U.S.C. § 5403(d).

3. This case was originally set for hearing on plaintiff's motion for a temporary restraining order. Fed.R.Civ.P. 65(a), (b). Prior to the hearing, HUD agreed to maintain the status quo until the Court could consider plaintiff's motion for a preliminary injunction. The injunction hearing was subsequently rendered moot by a decision in the Northern District of Indiana. *See Indiana Manufactured Housing Ass'n v. Pierce*, Civil Action No. S86–698 (N.D.Ind. Jan. 9, 1987) [Available on WESTLAW, DCT database]. Pending a merits determination in the Indiana case, HUD was enjoined nationwide from requiring compliance with its definition of manufactured housing under the Manufactured Housing Act. This Court is not bound by the decision of the Indiana Court. However, the injunction is-

## II. STATUTORY AND REGULATORY BACKGROUND

Congress enacted the Manufactured Housing Act in 1974 "to reduce the number of personal injuries and deaths and the amount of insurance costs and property damage resulting from manufactured home accidents and to improve the quality and durability of manufactured homes." 42 U.S.C. § 5401. To achieve this goal, the Act requires HUD to promulgate construction and safety standards, *see* 24 C.F.R. Part 3280, addressing, *inter alia*, the proper materials and manner of installing "fire safety, plumbing, heat-producing and electrical systems of manufactured homes." *Id.* at § 3280.1. The incentive offered by the Act is exemption from the myriad state and local regulations across the country which loosely track HUD's regulations. 42 U.S.C. § 5403(d).[4]

Pursuant to subsection 5402(6) of the Manufactured Housing Act, a "manufactured home" is defined as one which is,

> ... *transportable* in one or more sections, which in the traveling mode, is eight body feet or more in width or forty body feet or more in length, or, when erected on site, is three hundred twenty or more square feet, and which is built on a *permanent* chassis and designed to be used as a dwelling with or without a permanent foundation....

42 U.S.C. § 5402(6) (emphasis added). Neither the statute nor its legislative history further defines the term "permanent chassis." However, HUD's regulations help to make the phrase explicable. HUD defines a "chassis" to be "*the entire transporta-*

*tion system* comprising the following subsystems: drawbar and coupling mechanism, frame, running gear assembly, and lights." 24 C.F.R. § 3280.902(a) (emphasis added). HUD considers a chassis permanent as long as the underlying frame remains in place, which, in the vast majority of cases, requires only the maintenance of two steel I-beams.[5] Declaration of William C. Sorrentino, Director of HUD's Manufactured Housing and Construction Standards Division ("Sorrentino Declaration") at ¶ 6. Thus, pursuant to HUD's current policy, the axles, wheels, and drawbar may be removed without destroying the permanence of the chassis.

HUD's regulations further define permanence. Manufactured housing designs must provide the manner in which the floor will be attached to the chassis, 24 C.F.R. § 3280.305(a), (e), and must demonstrate that the chassis is designed to last the intended life of the manufactured home. 24 C.F.R. § 3280.904(a). The requirement of a permanent chassis becomes more understandable when considered in light of the fact that Manufactured Housing Act prohibits manufactured homes which are "designed only for erection or installation on a site-built permanent foundation" or are "not designed to be moved once so erected or installed." 42 U.S.C. § 5403(h)(1), (2). These strictures make clear that a permanent chassis is required to ensure that manufactured homes will remain "transportable" and truly mobile. 42 U.S.C. § 5402(6) (" 'manufactured home' means a structure, *transportable* ..." (emphasis added)).[6]

---

sued by that court has sufficed to prohibit HUD from acting to enforce its directives.

**4.** Prefabricated houses which do not meet HUD's standards are regulated by state and local building codes and are called "modular homes."

**5.** The most significant component of the chassis is the frame: "the fabricated rigid substructure which provides considerable support to the affixed manufactured home structure both during transport and on-site; and also provides a platform for securement of the running gear assembly, the drawbar and coupling mechanism." 24 C.F.R. § 3280.902(c).

**6.** In 1980, Congress amended the Mobile Home Construction and Safety Standards Act changing the name to the Manufactured Home Construction and Safety Standards Act. *See* Pub.L. No. 96–399, 94 Stat. 1614. In substituting the term manufactured home for mobile home, Congress emphasized that the "change is in name only. The committee's action will not in any way expand coverage under the various statutes ... or make any substantive changes affecting the regulation of mobile homes." S.Rep. No. 736, 96th Cong., 2d Sess. 41, 70 (1980), U.S.Code Cong. & Admin.News 1980, pp. 3506, 3548, 3576. Likewise, the Conference Report notes that the term "mobile home" is interchangeable with the

## III. FACTS

The action by HUD which resulted in ARR's filing this suit was the issuance of a letter-directive by defendant Sorrentino, Director of HUD's Manufactured Housing and Construction Standards Division. The letter was addressed to a Design Approval Primary Inspection Agency ("DAPIA"). Pursuant to HUD regulations, a DAPIA's function is to approve or disapprove designs for manufactured housing submitted by the producers of these homes.[7] *See* 24 C.F.R. § 3282.7(aa)(1). Sorrentino's letter transmitted HUD's disapproval of a DAPIA's decision to allow a manufactured home producer to build homes with a removable chassis.[8] Sorrentino's letter states, in pertinent part, that,

> [i]t has come to our attention that some DAPIAs have approved designs explicitly permitting chassis removal. This is to inform you that DAPIAs are not authorized to approve manufactured home designs permitting the removal of chassis.

Letter of William Sorrentino, Director of HUD's Manufactured Housing and Construction Standards Division (August 22, 1986) ("Sorrentino letter" or "Sorrentino directive").[9]

The Sorrentino directive was issued without notice either to the public or to manufacturers, who claim to have previously received continuous approval of removable chassis designs. The plaintiff maintains that the Sorrentino letter constitutes either legislative rulemaking which has failed to comply with the notice and comment requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, or an arbitrary and capricious definition of manufactured housing. To the contrary, HUD claims that the letter merely reaffirms the agency's long-standing policy disallowing the removal of the chassis from a manufactured home.

In considering the defendants' motions, the Court must determine whether HUD's directive constitutes a legislative rule pursuant to the APA or an interpretive bulle-

---

term "manufactured home" for purposes of the Act. H.R.Conf.Rep. No. 1420, 96th Cong., 2d Sess. 129 (1980), U.S.Code Cong. & Admin.News 1980, pp. 3617, 3674.

**7.** There are two kinds of primary inspection agencies: DAPIAs, which review and approve manufactured home designs, and Production Inspection Primary Inspection Agencies ("IPIAs"), which oversee the manufacturing process. 24 C.F.R. § 3282.7(aa). There are currently 12 DAPIAs across the country. They are licensed by HUD but perform their work under contract with the private manufactured home producers who submit designs to them. Only those designs which meet the specifications of a manufactured home pursuant to the Manufactured Housing Act may be approved by a DAPIA. Failure to so act may result in HUD's disqualifying a particular DAPIA. *See* Sorrentino Declaration at ¶ 2. Finally, DAPIAs are, in turn, reviewed by the National Conference on States or Building Codes and Standards ("NCSBCS"). NCSBCS acts as HUD's agent for monitoring DAPIAs' performance. Significantly, NCSBCS reviews only a randomly selected group of DAPIA approved designs, 24 C.F.R. § 3282.451(e) amounting to approximately ten percent of all the DAPIA approved designs received annually. Declaration of Shyam Choudary, Assistant Director and Chief Engineer of NCSBCS, at ¶ 3.

**8.** Such designs facilitate the placement of manufactured homes on a permanent foundation or basement. Plaintiff's Proposed Findings of Fact at ¶ 8. Removal of the chassis also reduces the cost of providing a basement since the ceiling height is increased. Declaration of William Heyn, President of Michigan Homes, ¶ 15. Plaintiff thus claims that the primary benefit is to the consumer who receives a building more akin to on-site housing. HUD notes that chassis removal also enables manufactured home producers to reuse the I-beam transportation system creating substantial economic savings. Defendants' Motion to Dismiss at 26. Defendants assert that the primary beneficiaries are manufactured home producers who gain a competitive advantage over manufacturers of HUD certified manufactured housing utilizing permanent chassis. HUD certification is a distinct advantage to manufacturers who are thereby authorized to place their products in interstate commerce without reference to local regulations because of the supremacy of Federal standards. 42 U.S.C. § 5403(d).

**9.** HUD subsequently sent similar letters to all 12 of its DAPIAs. Sorrentino Declaration at ¶¶ 3 and 4.

tin under HUD's regulations, also subject to informal rulemaking requirements of notice and comment, or whether HUD's directive is only an interpretive rule. In either case, the Court must decide whether the definition of a "manufactured home" stated by the Sorrentino letter should be sustained.

## IV. JURISDICTION

As a threshold issue, HUD questions this Court's jurisdiction. Subsection 5403(a) of the Manufactured Housing Act requires HUD to "establish by order appropriate Federal manufactured home construction and safety standards" ("construction and safety standards"). 42 U.S.C. § 5403(a). As previously noted, these standards address, *inter alia,* the proper materials and manner of installing "fire safety, plumbing, heat-producing and electrical systems of manufactured homes." *See* 24 C.F.R. § 3280.1. The jurisdictional provision of the Manufactured Housing Act specifies that,

> [i]n a case of actual controversy *as to the validity of any order under section [42 U.S.C. § 5403] [construction and safety standards],* any person who may be adversely affected by such order when it is effective may at any time prior to the sixtieth day after such order is issued file a petition with the United States court of appeals for the circuit wherein such person resides or has his principal place of business, for judicial review of such order.

42 U.S.C. § 5405(a)(1) (emphasis added). This grant of jurisdiction to the court of appeals is narrow. By its terms, the provision only applies to inquiries about the "validity of any order under section [42 U.S.C. § 5403]." The jurisdictional question thus reduces itself to whether the Sorrentino letter addresses the validity of a

HUD order relating to Federal construction and safety standards.

ARR maintains that jurisdiction is proper in this Court. The plaintiff attempts to support this proposition by assuming that the Sorrentino directive represents a modification of the construction and safety standards. *See* Plaintiff's Supplemental Opposition at 2. Pursuant to subsection 5405(a)(1), only the court of appeals has jurisdiction over "orders" relating to construction and safety standards. 42 U.S.C. § 5405(a)(1). However, pursuant to subsection 5403(b), all "orders" issued under the construction and safety standards section of the Act must be preceded by notice and an opportunity for comment. *See* 42 U.S.C. § 5403(b). ARR thus reasons that since HUD provided neither notice nor an opportunity for comment, the Sorrentino directive cannot constitute a valid subsection 5405(a)(1) type "order" triggering review by the United States court of appeals.[10]

This argument fails because the Sorrentino letter does not address the validity of an order relating to the construction and safety standards; rather, it seeks to define more clearly the term "manufactured home." Section 5403 of the Manufactured Housing Act requires the Secretary to "establish by order appropriate Federal manufactured home construction and safety standards." 42 U.S.C. § 5403. The statute does not define the scope of these standards. Part 3280 of HUD's regulations generally addresses construction and safety matters. 24 C.F.R. § 3280.1 *et seq.* The regulations are divided into groups and address topics like design of manufactured housing, proper equipment and installation, fire safety, plumbing, heating, and proper electrical systems. *See* 24 C.F.R. § 3280.-1(a). By setting forth specific criteria for producing manufactured housing, the regu-

---

**10.** The plaintiff further contends that subsection 5405(a)(1)'s requirement that the "Secretary ... shall file in the court [of appeals] the record of the proceedings on which the Secretary based his order" contemplates appellate review of orders after notice and comment. *See* 42 U.S.C. § 5405(a)(1); Plaintiff's Supplemental Opposi-

tion at 2–3. In the instant case, however, the question raised is legal, whether rulemaking procedures were required at all, and does not require resort to an administrative record. Thus, the absence of an administrative record would not preclude appellate review.

lations "seek, to the maximum extent possible, to establish performance requirements...." 24 C.F.R. § 3280.1(b).

In determining whether the Sorrentino directive is an order relating to construction and safety standards, two groupings of regulations are particularly significant: Subpart D, Body and Frame Construction Requirements, and Subpart J, Transportation. The regulations in both of these parts touch upon the uses of the chassis. Pursuant to Subpart J, the chassis is defined as the transportation system. 24 C.F.R. § 3280.902(f). As such, the chassis is required by HUD to be "designed and constructed as an integrated, balanced and durable unit which is safe and suitable for its specified use during the intended life of the manufactured home." 24 C.F.R. § 3280.904(a). Moreover, the chassis is required to sustain part of the design loads during transport, "in conjunction with the manufactured home structure." *Id.* at § 3280.904(b)(3). Pursuant to Subpart D, the chassis serves certain structural functions. For example,

> [r]oof framing shall be securely fastened to wall framing, walls to floor structure, *and floor structure to chassis* to secure and maintain continuity between the floor and the chassis, so as to resist wind overturning and sliding....

24 C.F.R. § 3280.305(a) (emphasis added). These regulations demonstrate that the construction and safety standards, like the Sorrentino directive, touch upon HUD's interpretation of the chassis' function.

■ However, the regulations do not convince the Court that the Sorrentino directive can be read as pertaining to the validity of an order concerning construction and safety standards. Rather, the letter explicitly addresses a legally and logically prior and totally separate question: What is a manufactured home? The Sorrentino letter focuses on the section of the Manufactured Housing Act entitled "Definitions" in which manufactured housing is statutorialy defined. *See* 42 U.S.C. § 5402(6). This definitional section of the Act is wholly separate from section 5403 describing construction and safety standards, and questions raised under it are not subject to review by the court of appeals. Thus, jurisdiction in this Court is proper on the ground that a federal question exists, 28 U.S.C. § 1331, relating to the definition of a manufactured home as identified in the Manufactured Housing Act. *See* ARR's Complaint at ¶ 6.[11]

## V. MERITS

The ARR's complaint relies upon the theory that the Sorrentino letter is a legislative rule which HUD failed to subject to informal rulemaking procedures, including notice and comment, as provided for by the APA, 5 U.S.C. § 553. As such, the ARR requests that the Court set aside HUD's interpretation of the term "manufactured home" as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In response, HUD seeks summary judgment.[12] For reasons provided hereafter, the Court will grant HUD's motion.

---

**11.** Because the Court concludes that jurisdiction is proper, it need not reach the dubious proposition that jurisdiction between this Court and the court of appeals is concurrent pursuant to subsection 5405(a)(1). *See Telecommunications Research and Action Center v. Federal Communications Comm'n*, 750 F.2d 70, 77 (D.C.Cir.1984).

**12.** Although the defendants seek judgment on the pleadings, both parties have introduced voluminous materials outside the pleadings. Accordingly, the Court will treat the motion to dismiss as one for summary judgment. *See*

Fed.R.Civ.P. 12(c); *Sacks v. Reynolds Sec., Inc.*, 593 F.2d 1234, 1239 (D.C.Cir.1978). Rule 56 of the Federal Rules of Civil Procedure states that summary judgment will be granted when,

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Thus, summary judgment will be appropriate in this case only if there is

## A. *Notice and Comment*

■ ARR founds its right to notice and comment upon the Manufactured Housing Act, referencing the APA, and the APA itself. Subsection 5403(b) of the Manufactured Housing Act specifies that,

[a]ll orders issued *under this section* [construction and safety standards] shall be issued after notice and an opportunity for interested persons to participate are provided in accordance with the provisions of section 553 of title 5, United States Code.

42 U.S.C. § 5403(b) (emphasis added). While subsection 5403(b) would be dispositive if HUD had issued an order pursuant to that section, the Court has previously held that the Sorrentino letter did not promulgate a construction and safety standard or an order issued under that section. *See, supra,* at 1045–1046. Accordingly, rulemaking is not required by subsection 5403(b).[13]

Whether APA section 553 itself requires rulemaking in the instant case is a more troublesome question. Ordinarily, section 553 requires federal agencies to provide notice in the Federal Register of proposed rulemaking and to provide an opportunity for interested persons to comment on the proposals. *See* 5 U.S.C. § 553. ARR contends that the Sorrentino letter "changes the concept of a 'manufactured home' as set forth in the Act and Regulations ... [and] amounts to indirect issuance of a regulation without notice or comment...." Complaint at ¶ 18. Consistent with this claim, ARR requests the Court to hold unlawful and set aside HUD's action as conduct which is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

To prevail, HUD must demonstrate that transmittal of the Sorrentino letter did not improperly fail to comply with the APA's requirements attending notice and comment rulemaking. Toward this end, HUD styles the Sorrentino letter an interpretive rule, the promulgation of which does not require notice or comment. In support of its position, HUD quotes the APA as follows: "[e]xcept when notice or hearing is required by statute, this subsection does not apply—(A) *to interpretive rules,* general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(3)(A) (emphasis added).[14] If the Sorrentino letter is an interpretive rule, then the plaintiff's claim that it was

---

no genuine issue of material fact. *See Adickes v. S & H Kress & Co.,* 398 U.S. 144, 153, 90 S.Ct. 1598, 1606, 26 L.Ed.2d 142 (1970). HUD bears the burden of demonstrating the absence of such facts. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the agency satisfies its burden, ARR will be obliged to prove that a material fact is in dispute. *See Greenberg v. Food and Drug Admin.,* 803 F.2d 1213, 1215–16 (D.C.Cir.1986). To assure that ARR is not deprived of its day in court, "the inferences to be drawn from the underlying facts contained in such materials [affidavits, depositions and exhibits] must be viewed in the light most favorable to the party opposing the motion." *Anderson, supra,* 106 S.Ct. at 2505 (1986).

**13.** Likewise, ARR is not entitled to notice and comment rulemaking procedures on the ground that the Sorrentino letter is an interpretive bulletin subject to informal rulemaking pursuant to HUD's regulations. *See* 24 C.F.R. § 3282.113(a). The regulation relied upon by the plaintiff states as follows:

[w]hen appropriate, the Secretary shall issue interpretive bulletins interpreting the stan-

dards [safety and construction standards] under the authority of § 3280.1(b) and (c) of this chapter or interpreting the provisions of this part [procedural and enforcement regulations]. Issuance of interpretive bulletins shall be treated as rulemaking under this subpart unless the Secretary deems such treatment not to be in the public interest....

24 C.F.R. § 3282.113(a). Pursuant to the language of this regulation, interpretive bulletins are only to be issued to interpret safety and construction standards or procedural and enforcement regulations. Because the Sorrentino letter is not such an interpretation, the quoted regulation is inapplicable in the instant case.

**14.** The plaintiff relies heavily on *Dow Chemical, U.S.A. v. Consumer Product Safety Comm'n,* 459 F.Supp. 378 (W.D.La.1978). That court focused on a different issue: the general statement of policy exemption stated by 5 U.S.C. § 553(b)(3)(A). Because HUD does not argue that the Sorrentino letters are exempt from rulemaking under the general statement of policy exemption, *Dow Chemical* is inapt.

entitled to notice and an opportunity for comment must fail.

■ The question presented is thus whether the letter is a legislative or interpretive rule. The distinction between legislative and interpretive rules has been aptly stated by a leading commentator:

[a] legislative rule is the product of an exercise of delegated legislative power to make law through rules. An interpretive rule is any rule an agency issues without exercising delegated legislative power to make law through rules.

K. Davis, Administrative Law Treatise § 7.8 (1979). Thus, a court can rule out the · possibility that a rule is legislative when an agency is not empowered by Congress to issue rules having the force of law. *Cf. Joseph v. United States Civil Service Comm'n,* 554 F.2d 1140, 1153 n. 24 (D.C. Cir.1977). The Manufactured Housing Act appears to limit HUD's authority to promulgate legislative rules to the issuance of construction and safety standards. *See* 42 U.S.C. § 5403. Given the Court's earlier finding that the Sorrentino directive does not establish such a standard, it follows that HUD was not authorized to issue a legislative rule defining the term "manufactured home."

■ Even if HUD had the delegated power to issue a legislative rule relating to the definition of a manufactured home, it is clear to the Court that the agency did not intend to do so. In his affidavit, William Sorrentino, the author of the Sorrentino directive, states that the purpose of the letters he sent to the DAPIAs was "to remind" them of their obligations under the Manufactured Housing Act, not to create new duties and obligations. *See* Supplemental Sorrentino Declaration at ¶ 4. However, in *General Motors Corp. v. Ruckelshaus,* 742 F.2d 1561 (D.C.Cir.1984) (en banc), *cert. denied sub nom. General Motors Corp. v. Thomas,* 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985), the United States Court of Appeals for the District of Columbia Circuit observed that divining an agency's intent is a difficult task, and the agency's own character-

ization, while relevant, does not control. *Id.* at 1565.

More telling is the substance of the agency's action. *See Chamber of Commerce of the United States v. Occupational Safety and Health Admin.,* 636 F.2d 464, 468 (D.C.Cir.1980). To properly elevate substance over agency classification, a better understanding of interpretive rules is necessary. In *Chrysler Corp. v. Brown,* 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), the Supreme Court noted that interpretive rules are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Id.* at 302 n. 31, 99 S.Ct. at 1718 n. 31 (quoting the Attorney General's Manual on the Administrative Procedure Act (1947)). Thus, as the Court of Appeals in this Circuit has stated,

'[i]f you had an expression in a statute such as "Interurban Railway," the query might come up as to what is an "interurban railway." A particular agency may adopt a rule defining an interurban railway. That, in a sense, may be called an interpretive rule.'

*Gibson Wine Co. v. Snyder,* 194 F.2d 329, 332–33 (D.C.Cir.1952) (quoting "Rule Making Under the Administrative Procedure Act" by David Reich, in Volume VII, New York University School of Law Institute Proceedings, pages 492, 516 (Feb.1947)).

In the case at bar, the Sorrentino letter states,

It has come to our attention that some DAPIAs have approved designs explicitly permitting chassis removal. This is to inform you that DAPIAs are not authorized to approve manufactured home designs permitting the removal of chassis. Section 603(6) [42 U.S.C. § 5402(6) ] of the National Manufactured Housing Construction and Safety Standards Act of 1974 defines a "manufactured home" as being "built" on a permanent chassis. This concept that a manufactured home is a structure built on a permanent chassis is central to the definition of a manu-

factured home. It is an essential distinction between modular housing and manufactured housing ... You are hereby directed to undertake an examination of each design package approved by your agency, and to withdraw your approval of any design elements that permit chassis removal.

Sorrentino letter. The Court reads this letter as a simple statement of what HUD thinks section 5402(6) means. In *Ruckelshaus, supra,* our Court of Appeals held that "[a]n interpretive rule simply states what the administrative agency thinks the statute means, and only 'reminds' affected parties of existing duties." 742 F.2d at 1565. For all the foregoing reasons, the Court holds that the Sorrentino letter is an interpretive rule not subject to the requirements of notice and comment rulemaking pursuant to 5 U.S.C. § 553.[15]

B. *Propriety of the Sorrentino Directive*

■ Having ruled that the Sorrentino directive is a legislative rule, the Court's final task is to determine whether the rule should be sustained upon review. The ARR seeks a declaration that HUD's interpretation of a "manufactured home" should be overturned on the ground that it is arbitrary and capricious. *See* Complaint at ¶ 21. That standard of review, applicable to legislative rules, is not properly applied to interpretive rules. Rather, as the Supreme Court has stated the agency's interpretation is entitled to substantially less deference:

> a court is not required to give effect to an interpretive regulation. Varying degrees of deference are accorded to administrative interpretations, based on such factors as the timing and consisten-

cy of the agency's position, and the nature of its expertise.

*Batterton v. Francis,* 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977).

■ In considering HUD's interpretation of subsection 5402(6), it is axiomatic that the Court's foremost duty is to enforce the will of Congress. Thus, regardless of HUD's expertise or past practices, if the Sorrentino letter contravenes congressional intent, it must be stricken. *See Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 125, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985).

Section 5402(6) of the Manufactured Housing Act defines a "manufactured home" as "a structure, *transportable* in one or more sections, ... and which is built on a *permanent chassis* and designed to be used as a dwelling with or without a permanent foundation...." 42 U.S.C. § 5402(6) (emphasis added). ARR contends that the definition of a "permanent chassis" incorporates the design practice of strengthening the manufactured home structure in order to make possible the removal of the elements of the chassis defined by HUD's regulations: the drawbar and coupling mechanism, frame, running gear assembly and lights. *See* Complaint at ¶ 19. To the contrary, HUD argues that removal of the transportation system, regardless of any strengthening of the home structure, constitutes removal of the chassis contrary to the statute's plain requirement of a "permanent chassis." Neither side disputes that the chassis, whatever it is, must be permanent. *See* Plaintiff's Response to the Court's Request for Additional Evidence at 3. The current controversy is over what constitutes the "chassis" of a

---

**15.** *Ruckelshaus* further states that "if by its action the agency intends to create new law, rights or duties, the rule is properly considered to be a legislative rule." *Id.* Although the Sorrentino letter may have clarified rights and duties, it clearly does not contemplate the creation of *new* rights or duties. Sorrentino's directive to

the DAPIAs to withdraw their approval of designs allowing removable chassis merely restates the language of the Manufactured Housing Act. The Court finds that Sorrentino's intent was to remind the DAPIAs of their statutory obligation.

manufactured home within the meaning of the Act. To this question neither the statute nor its legislative history provides any further guidance. As such, the Court concludes that Congress' will is not plain.

■ To determine the meaning of the term "permanent chassis," the Court, like the parties, turns to HUD's regulations. There the transportation system used to move a manufactured home is defined as the chassis. *See* 24 C.F.R. § 3280.902(f). More particularly, the "chassis" is defined as "the entire transportation system comprising the following subsystems: drawbar and coupling mechanism, frame, running gear assembly, and lights." 24 C.F.R. § 3280.902(a). Pursuant to the regulations, "the entire [transportation] system ... shall be designed and constructed as an integrated, balanced and durable unit which is safe and suitable for its specified use during the intended life of the manufactured home." 24 C.F.R. § 3280.904(a). The Court concludes that these regulations establish that a permanent chassis, as the Sorrentino letter states, entails a non-removable transportation system.

Conversely, in furtherance of its claim that the drawbar, frame, running gear assembly and lights may be removed, ARR directs the Court's attention to a Note associated with 24 C.F.R. § 3280.904(a) entitled "Specific requirements for designing the transportation system." The Note provides that,

> [w]hile the majority of manufactured homes utilize a fabricated steel frame assembly, upon which the manufactured home structure is constructed, it is not the intent of this standard to limit innovation. Therefore, other concepts, such as integrating the frame function into the manufactured home structure, are acceptable provided that such design meets the intent and requirements of this part.

24 C.F.R. § 3280.904(a) (Note). According to ARR, this Note "shows an intention to allow wide latitude in selecting a design for the 'transportation function' as long as the objectives of a strong durable structure are achieved." Complaint at ¶ 20. On the basis of this Note, ARR claims that it is permissible for manufactured home producers to design homes which "integrate the frame function into the manufactured home structure" thereby making the underlying frame, used solely for transportation, superfluous and removable.

In the Court's opinion, the Note relied upon does not reflect any such intention. Pursuant to HUD's regulations, the frame of a manufactured home is defined as the rigid substructure which "provides considerable support ... both during transport and on-site; and also provides a platform for securement of the running gear assembly, the drawbar and coupling mechanism." 24 C.F.R. § 3280.902(c). The Note addresses itself exclusively to the question of what is a proper frame. Although acknowledging that an independently affixed steel frame is the norm, the Note states that "integrating the frame function into the manufactured home structure" would be an acceptable alternative to an independent frame so long as "such design meets the intent and requirements of this part." 24 C.F.R. § 3280.904(a) (Note).

As the Court and HUD interpret it, the Note contemplates a frame, made of any acceptable material, which is built into the underside of a manufactured home and functions, both in transport and on-site, as a platform to which a running gear assembly, drawbar and coupling mechanism may be affixed. The difference between such a frame and that ordinarily used would be in the material used and the fact that such a frame would be integrated into the home and not an independent mechanism. This interpretation comports with the statute's requirement of a "permanent chassis" and insures that the manufactured home will remain "transportable" throughout the life of the unit.

The materials submitted by both parties include only three instances in which HUD

has relied upon the Note at 24 C.F.R. § 3280.904(a). In every case, HUD found that there was no need for a traditional free-standing frame because the manufacturer had integrated the frame function into the bottom of the manufactured home. *See* letter from John Mason, Director, Enforcement Division Office of Mobile Home Standards, to Jack Stroud, Administrator of Department of Industrial Services (Nov. 23, 1979) (steel beams under home function as frame and part of chassis) (Defendants' Notice of Filing, Ex. I); letter from Phillip Abrams, Assistant Secretary at HUD, to Gary Korpela of Wick Building Systems (Jan. 11, 1983) (wood frame permits chassis to be integrated into structure of home) (Plaintiff's Ex. F); letter from Shirley McVay Wiseman, General Deputy Assistant Secretary for HUD, to Ben D. Woody, President of Brinkcraft, Inc. (Oct. 21, 1984) (wood frame permits chassis to be integrated into the floor of each story of a bi-level manufactured home). In no case did HUD ever expressly permit a manufacturer to overbuild the underside of the home, trans-

port it on a traditional metal frame, and then discard the transportation frame. Such an interpretation of the Note at 24 C.F.R. § 3280.904(a) would, contrary to the regulation's language, not conform with the requirements of Part 3280, *see supra* at 1043–1044, 1046, 1050–1051, and, in addition, would defeat the purpose of the Manufactured Housing Act to create "transportable" homes. *See* 42 U.S.C. §§ 5402(6), 5403(h)(1), (2).[16]

Even accepting that HUD's present interpretation of a permanent chassis is reasonable, ARR claims to possess evidence tending to prove that the Sorrentino letter does not comport with prior agency policy and therefore should be overturned. Given the Court's conclusion that HUD's interpretation of subsection 5402(6) is reasonable, there is no need for extensive review of prior agency conduct. Besides, given the evidence put before it, the Court is not persuaded that the Sorrentino letter does depart from HUD's prior definitions of a manufactured home.[17] Therefore, the

---

**16.** By affidavit, William Sorrentino states that his letter directive was not intended to abrogate or modify in any way the agency's construction of the Note to section 3280.904(a). 24 C.F.R. § 3280.904(a). All such innovations will continue to be permitted. *See* Supplemental Sorrentino Declaration at ¶ 3.

**17.** HUD has satisfied its burden of demonstrating the absence of any prior agency approval of the industry practice of removing chassis. *See* Celotex, *supra,* 106 S.Ct. at 2553. It is true that some removable chassis designs have been permitted. *See* Declaration of James F. Shea, Executive Committee Chairman of Fairmont Homes, Inc., at ¶ 2. However, it is undisputed that HUD's agent, NCSBCS, only reviews approximately ten percent of all DAPIA approved designs. *See* Declaration of Shyam Choudary, Assistant Director and Chief Engineer of NCSBCS, at ¶ 3. Significantly, there is no evidence in the record that HUD officials approved manufactured home producers' decisions to overbuild homes and to discard the transportation frame. Rather, there are numerous affidavits submitted by manufacturers declaring that they believed the practice to be proper. *See* Decl. of William C. Heyn, President of Michigan Homes; Decl. of Vernon Sailor, President of Indiana Manufactured Housing Association; Decl. of Dennis Bea-

dle, President of Victorian Homes, Inc; Decl. of Sam Weidner, President of Patriot Homes. In addition, there is evidence that plaintiff's notion was adopted by a group of DAPIAs who recommended the idea to a subcommittee of NCSBCS. *See* DAPIA Technical Advisory Group Meeting of October 18, 1978 (attached to Plaintiff's Ex. B). Plaintiff provides no evidence that NCSBCS either adopted this recommendation or transmitted it to HUD. There is evidence that the plaintiff's position was raised before HUD officials at a DAPIA/IPIA workshop in Kansas City, Missouri on May 5, 1982. However, at that workshop, HUD unequivocally stated that the transportation frame could not be removed from a manufactured home. *See* Decl. of J. Donald Waldmer, (attached to Plaintiff's Ex. B at 137–38). Plaintiff claims that HUD officials have approved the practice formally and on informal inspection visits but cannot identify which HUD officials gave the approval. *See, e.g.,* letter from Fred H. Jolly, Director of Nebraska DAPIA, to all Nebraska manufactured home manufacturers (June 22, 1978). Finally, ARR claims that HUD tacitly approved the practice in 1983 at a demonstration of "Affordable Housing" in Elkhart, Indiana, when HUD officials were informed of the practice and did not forbid it. Even viewing this evidence in a light

Court will sustain the agency's definition of a manufactured home and grant HUD's motion for summary judgment.

## VI. CONCLUSION

In sum, the Court finds that jurisdiction is proper. Thus, HUD's motion to transfer or dismiss the case pursuant to 42 U.S.C. § 5405(a)(1) is denied. On the merits, the Court holds that the Sorrentino letter is an interpretive rule and therefore its promulgation did not guarantee plaintiff the right to notice and an opportunity for comment. *See* 5 U.S.C. § 553(b)(3)(A). Finally, after a review of the statute, HUD's regulatory scheme, and the agency's prior policy, the Court holds the substance of the Sorrentino directive to be wholly reasonable. Accordingly, finding no genuine issue of material fact, the Court will grant HUD's motion for summary judgment.

most favorable to ARR, *Anderson, supra,* 106 S.Ct. at 2505, the Court cannot agree that tacit approval of this practice at a site study, the purpose of which was to demonstrate affordable housing, is proof of agency policy. HUD did not specifically approve these nonconforming designs. It is true that one of these houses appeared in a report produced by the NAHB research foundation as an example of proper manufactured housing. *See* Declaration of Daniel Gilligan, President of the Manufactured Housing Federation (Attachment to Plaintiff's Ex. I at 23). However, it is undisputed that HUD granted a no enforcement letter to the manufacturer of that nonconforming home in order to allow production for the Elkhart demonstration. *See* letter to Douglas Mills, Director of Codes at Schult Homes Corporation, from Phillip Abrams, Assistant Secretary of HUD at Defendants' Ex. 9. Schult was specifically prohibited from building any further homes of the same design. *Id.*