ASSOCIATION FOR REGULATORY
REFORM, Appellant,

v.

Samuel R. PIERCE, Jr., Secretary, U.S.
Department of Housing & Urban
Development, et al.

No. 87–5339.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 11, 1988.

Decided June 14, 1988.

Edward F. Canfield, Washington, D.C., for appellant.

Michael J. Ryan, Asst. U.S. Atty., with whom Timothy J. Reardon, III, Principal Asst. U.S. Atty., Gershon M. Ratner, Associate Gen. Counsel, U.S. Dept. of Housing and Urban Development, John D. Bates, R. Craig Lawrence and John C. Martin, Asst. U.S. Attys. and Carl A. Tibbetts, Atty., U.S. Dept. of Housing and Urban Development, Washington, D.C., were on the brief, for appellees. Joseph E. diGenova *, U.S. Atty. and Royce C. Lamberth *, Asst. U.S. Atty., Washington, D.C., also entered appearances for appellees.

Before WALD, Chief Judge, and ROBINSON and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

* At time of appearance.

STARR, Circuit Judge:

T.S. Eliot wrote of what he called the permanent things of life. This case requires us to reflect on the concept of permanency in the distinctly non-literary setting of manufactured homes (known to the layman as mobile homes), which are regulated by the Department of Housing and Urban Development. More specifically, we will now be ushered into the world of such bedrock statutory concepts as "permanent chassis," which turns out to be a *sine qua non* of a "manufactured home" within the meaning of the pertinent federal statute. And it is federal law that is invoked by housing manufacturing firms seeking, by virtue of a broad preemption provision in the federal statute, to escape the tender mercies of housing inspectors enforcing the parochial demands of local law.

## I

This lawsuit sounds in the familiar arena of administrative law, but it comes to us on appeal from the District Court rather than from the agency. An understanding of the case is best achieved by beginning with the operative event at the administrative level and permitting that event to lead us into the specific precincts of the pertinent statute and of the dispute that has since erupted within the manufactured home industry.

In 1986, a HUD official by the name of William Sorrentino sent a standard letter to manufactured housing design inspectors across the country. The letter informed the inspectors, known in the trade as DAPIAs, that their approval could not properly be granted to manufactured home designs permitting the removal of a structure's chassis, the definition of which we shall set forth presently. The letter specifically referred to the operative statutory provision, namely section 603(6) of the National Manufactured Housing Construction and Safety Standards Act of 1974, 42 U.S.C. §§ 5401–5426 (1982). In pertinent part, that statute defines a "manufactured home," the pivotal concept for purposes of avoiding state regulation and remaining within the preemptive harbor of federal law, as one "built on a permanent chassis."

42 U.S.C. § 5402(6). In Mr. Sorrentino's view, as expressed in the letter, certain DAPIAs had been approving as compatible with federal standards designs that permitted the removal of chassis. This, Mr. Sorrentino made clear in no uncertain terms, would not do:

> [The] concept that a manufactured home is a structure built on a permanent chassis is central to the definition of a manufactured home. It is an essential distinction between modular housing and manufactured housing. * * * You are hereby directed to undertake an examination of each design package approved by your agency, and to withdraw your approval of any design elements that permit chassis removal.

Letter from William Sorrentino, Director, Manufactured Housing and Construction Standards Division, to William Kalker, DAPIA Administrator (Aug. 22, 1986), Joint Appendix (J.A.) at 32 (hereinafter "Sorrentino Letter").

The Sorrentino letter eventuated in the filing of this lawsuit. In the view of the Association for Regulatory Reform (a non-profit group composed of manufactured home producers), the directive constituted a legislative rule, effecting a substantive change in HUD's policy, but without the benefit of the notice-and-comment procedures ordained by the APA. To compound this asserted procedural error, the Association maintained, the directive ushered in an altogether new and statutorily improper regime, denying HUD approval to home designs that integrated the chassis into the home itself and thereby permitted the removal of transportation frames upon installation at the home site.

HUD disagreed with the Association in both respects. In the first instance, HUD viewed the Sorrentino missive as a reminder and directive to the field, nothing more, nothing less. That directive, moreover, was merely a restatement of federal statutory requirements which the DAPIAs were already duty bound to apply. As such, HUD maintained, the letter was not a "rule" for purposes of the APA; however, even if the directive were deemed to consti-

tute a "rule," it was nonetheless an interpretative rule exempt from the APA's notice-and-comment requirements. As to the substance of the unfolding dispute, HUD maintained that there was no real controversy between the parties. As HUD saw it, the letter constituted, again, only a modest, unexceptional restatement of what the literal terms of federal law demanded.

HUD's position was not without force. Upon analysis, it did not appear that the Association was in any sense disputing the literal terms of the Sorrentino directive. To the contrary, the Association readily admitted that the statute did indeed require that a structure's chassis be "permanent" to qualify for the "manufactured home" appellation. As we have just seen, the Sorrentino letter, on its face, simply reasserted that fundamental requirement. Nonetheless, the Association voiced fears as to what the letter portended for the future. Although the specific language of the letter might be unexceptionable, the Association's concern was that, in the guise of the Sorrentino letter's "reminder," HUD was in actuality effecting a dramatic shift in regulatory policy which would stifle private-sector innovation. The essence of this fear is captured in the following passage from the Association's brief:

> The intended effect of this directive is not facially apparent because of the Director's overly simplistic use of the term "removable chassis." [The Association] believes that the policy implied in the letters severely and illegally limits the future growth and innovation in the industry.

Appellant's Brief at 9.

Given the rather amorphous nature of the Association's concerns, HUD viewed the case as a non-case. It was, as the agency saw it, a litigation analogue to Gertrude Stein's unflattering description of Oakland. There was no there there. That is, the warring litigants were in happy accord (but curiously so for litigants) that the governing statute required a structure's chassis to be "permanent." More specifically, the Association did not quarrel with HUD's long-standing regulations implementing the statute and giving definition to the pivotal term, "permanent chassis." Those regulations, codified at 24 C.F.R. Part 3280, define "chassis" for purposes of applicable construction and safety standards as "the entire transportation system comprising the following subsystems: drawbar and coupling mechanism, frame, running gear assembly, and lights." *Id.* § 3280.902(a). "Frame," in turn, is defined as "the fabricated rigid structure which provides considerable support to the affixed manufactured home structure both during transport and onsite." *Id.* § 3280.902(c). What is more, the regulations, eschewing the creation of Procrustean regulatory beds, contain a special provision encouraging innovation. A regulatory "Note," much beloved by the Association, states that while a majority of manufactured homes utilize a fabricated steel frame assembly upon which the home is constructed, the federal standard is not intended to curb innovation, such as integrating a frame into the housing structure, as long as the "design meets the intent and requirements of this part." *Id.* § 3280.904(a) Note.

Despite the litigants' consensus on what the law required, the parties fell into disaccord over the status of specific, less traditional housing designs. What had started off as a straightforward and relatively manageable legal dispute over the Sorrentino letter soon escalated into a pitched battle over the agency's intentions, with industry accusing HUD of covertly assaulting various newer manufactured home designs. Industry's survey of the regulatory front found the agency shifting course, suddenly expelling from the much-desired ranks of "manufactured housing" designs which had previously enjoyed HUD approbation. The original HUD policy, as embodied in the regulations, is articulated in the following portion of the Association's brief, which will have a more self-evident meaning to construction designers than to generalist lawyers (and judges):

> Traditionally, manufactured homes have utilized a frame consisting principally of two steel I-beams. In a conventional setting, these beams support the home both

during the transportation phase and after installation at the homesite. The HUD manufactured housing code, however, expressly permits the frame to be integrated into the manufactured home structure. When this alternative design is utilized, the "frame" is built with wood rather than steel I-beams.... Nevertheless, a steel transportation "frame" is used in those cases to transport the home to the purchaser's property. The transportation system is then discarded upon permanent installation of the home. In this manner, the home, as installed, has a permanent wood frame, but the steel transportation "frame" may be reused. In any event, the home remains "transportable" within the meaning of the Act because it may be remounted on a transport frame, just as other "chassis" subsystems, such as the drawbar, running gear and lights, may be remounted at the time of removal to a different site.

Appellant's Brief at 10–11.

The traditional regulatory approach had manifested itself, the Association maintained, in specific HUD approval of non-traditional designs with integrated wooden frames. At the top of the list of industry examples is what is dubbed in the briefs and other papers as the Wickfield model. Appellant's Brief at 11, 18–24. Trumpeting the fact of HUD's prior approval of the Wickfield design, the Association points to a Departmental imprimatur which stated: "[W]e have determined that the Wickfield model is a manufactured home despite the fact that it does not have a traditional metal chassis. * * * In the Wickfield model, the chassis has, in fact, been integrated into the structure. * * * The wood chassis is permanent, and therefore, the Wickfield model is a 'manufactured home.'" Letter from Philip Abrams, Assistant Secretary, to Gary Korpela, Wick Building Systems, Inc. (Jan. 11, 1983), J.A. at 34, *quoted in* Appellant's Brief at 11.

Such halcyon days of yesteryear were no more the Association complained, with a brave and decidedly undesired new world ushered in by the Sorrentino missive. Now Wickfield models and the like were in danger, inasmuch as HUD had in the space of a short, seemingly innocuous letter radically altered the regulatory landscape.

## II

Thus it came to be that the District Court was confronted in this suit with two different sets of questions. The first set related to the legality of the Sorrentino letter's origins, namely whether that letter should have been processed through the familiar APA apparatus of notice and comment. The second set of questions, however, was far less definite and concrete, with the parties arguing back and forth about what sorts of designs could now pass muster in the wake of the Sorrentino directive. To understand this proliferation of technically grounded issues, we turn now to the District Court's opinion as our final guidepost in the arcane world of housing designs. *See Ass'n for Regulatory Reform v. Pierce*, 670 F.Supp. 1041 (D.D.C.1987).

## A

With respect to the notice-and-comment issue, the District Court thoroughly canvassed the pertinent authorities that shed light on the critical distinction (for notice-and-comment purposes) between legislative rules and interpretative rules. The former, of course, embody the exercise of delegated power from the Article I branch; as such, legislative rules require the employment (with certain statutorily enumerated exceptions which need not detain us) of procedures to notify the public of the proposed agency action and to invite responses expressing opinions, views on policy, or additional information that may be of assistance to the agency in its exercise of delegated powers. Interpretative rules, in contrast, do not constitute the exercise of (delegated) legislative power. To the contrary, in the modern administrative state, agencies are invariably called upon to read and interpret the statutory provisions that they are charged with administering and enforcing.

To capture this distinction, Judge Gasch's opinion below aptly returned to one of the original guides to judicial under-

standing, namely the Attorney General's Manual on the Administrative Procedure Act promulgated forty-one years ago on the heels of Congress' enactment of the APA. As quoted in pertinent part by the Supreme Court in *Chrysler Corp. v. Brown*, 441 U.S. 281, 302, 99 S.Ct. 1705, 1718, 60 L.Ed.2d 208 (1979), and by Judge Gasch, *Ass'n for Regulatory Reform*, 670 F.Supp. at 1048, the Attorney General's Manual had this to say: "[Interpretative rules are] issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." Drawing on this court's various opinions on the subject, and in particular our *en banc* decision in *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561 (D.C. Cir.1984) (*en banc*), the District Court concluded that the Sorrentino letter did not rise to the lofty level of a legislative rule. Judge Gasch succinctly stated the point in the following way: "The Court reads [the Sorrentino] letter as a simple statement of what HUD thinks [the statute] means." *Ass'n for Regulatory Reform*, 670 F.Supp. at 1049.

**B**

The trial court then went on to examine the "propriety" of the Sorrentino directive. Judge Gasch observed, as we have previously adumbrated, that "[n]either side disputes that the chassis, whatever it is, must be permanent." *Id.* It was, the court indicated, the entirely new issue of the meaning of "chassis" that now constituted the principal bone of contention. Here is how the District Court succinctly described the new dispute: "The current controversy is over what constitutes the 'chassis' of a manufactured home within the meaning of the Act. To this question neither the statute nor its legislative history provides any further guidance." *Id.* at 1049–50.

Accordingly, the trial court embarked on a thorough, careful analysis of the meaning of "permanent chassis," including an examination of the Department's regulations. On the basis of that examination, the District Court concluded that a permanent chassis "as the Sorrentino letter

states, entails a *non-removable* transportation system." *Id.* at 1050 (emphasis added). Rejecting the Association's reliance upon the Note that follows § 3280.904(a), the District Court concluded with the following:

[T]he Note contemplates a frame, made of any acceptable material, which is built into the underside of a manufactured home and functions, both in transport and onsite, as a platform to which a running gear assembly, drawbar and coupling mechanism may be affixed. The difference between such a frame and that ordinarily used would be in the material used and the fact that such a frame would be integrated into the home and not an independent mechanism.

*Id.*

Analyzing various materials submitted by the parties concerning HUD's prior reliance on the regulatory Note, the trial court determined that the agency had in each instance "found that there was no need for a traditional free-standing frame because the manufacturer had integrated the frame function into the bottom of the manufactured home. * * * In no case did HUD ever expressly permit a manufacturer to overbuild the underside of the home, transport it on a traditional metal frame, and then discard the transportation frame." *Id.* at 1051. The court therefore concluded that the agency's "present interpretation," which prohibited chassis removal, was reasonable; this led the District Judge further to conclude that the Association's proffered evidence of inconsistent agency conduct in design approvals was unavailing. "[G]iven the evidence put before it, the Court is not persuaded that the Sorrentino letter does depart from HUD's prior definitions of a manufactured home." *Id.*

**III**

On appeal, the Association trains its fire primarily on the District Court's substantive interpretation of the statute and accompanying regulations. As the Association sees it, the trial court has added its imprimatur to a major overhaul of HUD's position stemming from (but not expressly

articulated in) the Sorrentino letter. Accordingly, the Association urges the court to reverse the substantive interpretation embraced by the trial court, and in the process to condemn the Sorrentino letter as a legislative rule which lacks the APA-required pedigree. The Association also complains that the District Court went beyond the permissible bounds ordained by Rule 56 of the Federal Rules of Civil Procedure. Specifically, appellant argues that the trial court erred in adjudicating on summary judgment the "merits" question of HUD's practices and policies without conducting an evidentiary hearing to address and resolve the factual contradictions that abound in the record.

For its part, the Government returns to the genesis of the litigation and contends that the Sorrentino letter does not constitute a legislative rule. The Department then suggests that the District Court was correct on the "merits," which as the Government sees it boil down to the proposition that the Sorrentino letter is consistent with HUD's regulatory Note permitting integrated frame manufactured homes. In closing, the Department returns to the procedural aspects of the case, vigorously defending the trial court's employment of summary judgment procedures.

## IV

### A

■ Upon analysis, we find ourselves in full accord with Judge Gasch's determination that the Sorrentino letter constitutes only an interpretative rule. As we previously saw, the Manufactured Housing Act contains a specific definition of the pivotal term, "manufactured home," that includes the particular requirement that the structure be one that is "built on a permanent chassis." 42 U.S.C. § 5402(6). It is that requirement that the Sorrentino letter rearticulates, employing the language of the statute itself. Thus, we are satisfied that the letter by its terms constitutes only a restatement of the operative statute. As such, the Sorrentino letter fits precisely within this court's *en banc* description of an interpretative rule, namely, that it is one

which "reminds the affected parties of existing duties." *General Motors Corp. v. Ruckelshaus,* 742 F.2d at 1565. In his short, pithy letter, Mr. Sorrentino did precisely that.

The letter, to recap briefly, stated that it had come to the Department's attention that "some DAPIAs have approved designs explicitly permitting chassis removal." Sorrentino Letter, J.A. at 32. This, the letter went on to say, was improper under the statute, which the letter then quotes: "Section 603(6) ... defines a 'manufactured home' as being 'built on a permanent chassis.'" *Id.* The "permanent chassis" feature was then described in the Sorrentino missive as "central to the definition of a 'manufactured home.'" *Id.* Indeed, this distinction was characterized as the essential difference between modular housing and manufactured housing. *Id.* The DAPIAs were therefore instructed to conform their design approvals to the demands of the statute and implementing regulations. *Id.* In view of the limited office of the Sorrentino letter, we cannot but agree with Judge Gasch's dispositive sentence, which we again take the liberty to quote and embrace as our own conclusion: "The Court reads this letter as a simple statement of what HUD thinks section 5402(6) means." *Ass'n for Regulatory Reform,* 670 F.Supp. at 1049.

■ That being so, it necessarily follows that the notice-and-comment provisions of the APA were not triggered by the letter. Nor can the Association successfully repair to the Department's own regulations to pick up where the APA leaves off. The Association devotes a passing two paragraphs in its brief to the proposition that HUD's procedural regulations required the Department to issue an "Interpretative Bulletin" under the circumstances presented here. We disagree. By their terms, the regulations contemplate the issuance of such Bulletins when the Department is interpreting "construction or safety standards" or "procedural and enforcement regulations." 24 C.F.R. §§ 3282.113(a), 3280.1(b), (c) (1987). The Sorrentino letter, as the District Court rightly concluded, did

not constitute an interpretation of such standards or regulations. The letter, again, merely reminded DAPIAs of already extant statutory and regulatory provisions. It did not purport to "interpret" any regulations. A restatement, in sum, is not an interpretation.

## B

Having so concluded, we are persuaded that the District Court could more appropriately have ended its analysis upon determining that the Sorrentino restatement of applicable law and regulations was "reasonable." Notwithstanding the numerous submissions to the trial court directed to the issue, it was not a specific set (or sets) of design standards that was before the District Court for resolution. To be sure, the litigation rather promptly evolved into a pitched battle over various housing designs and whether prior HUD design approvals were now, as the Association saw it, being disavowed by the agency. The record, accordingly, proliferated with exhibits pertaining to various designs and arguments over precisely what the agency had in fact approved in the course of its prior actions. Implicitly accommodating the parties' willingness to expand the litigation, the District Court proceeded to adjudicate rather specific design questions in the course of granting summary judgment. That tack has now brought about an entirely separate set of arguments as to the appropriateness of the grant of summary judgment under Rule 56 as elucidated by such recent Supreme Court decisions as *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, the parties joust over the District Court's determination on the broader "merits" question that HUD had never adopted the flexible definition of "permanent chassis" as alleged by the Association.

Upon analysis, however, we are persuaded that we need not, and indeed should not, plumb the depths of various housing designs nor examine in detail the merits (and consistency *vel non*) of HUD's prior actions. The reason for our forebearance is simple: properly conceived, this litigation is, at bottom, over the Sorrentino letter and its meaning. We are, at day's end, unable to discern in that letter any design-specific determination at all. Indeed, in this regard, the "message" of the brief Sorrentino letter is susceptible of several interpretations. The letter could conceivably be given a "hard" reading so as to prohibit the removability of any portion of the "chassis," including the running gear. This sort of construction, the Association complains, would be wildly overinclusive and so nonsensical as to be arbitrary and capricious. The Department, not surprisingly, poohpoohs the Association's jeremiads and loftily praises, but in very general terms, the District Court's "merits" resolution.

In our view, the record is inadequate to resolve the manifold sub-disputes over housing designs that this litigation has spawned. We are invited, for example, to parse in minute detail the minutes of agency-industry gatherings in Kansas City to determine what was said and what remained unsaid on the design issue. We are referred to a variety of designs which have received Departmental approval in the past, but as to which the parties are now in violent disagreement (that is, as to the effect of what the agency actually did in years past). The parties, accordingly, parry and thrust over whether the agency has conducted itself consistently. It is, on this record, all somewhat bewildering; put more precisely, this record, we are persuaded, simply does not lend itself to the orderly resolution of these questions concerning specific designs. Quite apart from the propriety of summary judgment on the basis of this record, we are content to adjudicate the issues raised in this case in the first instance, and not to go beyond to resolve questions that have emerged as the warring sides have fired their respective volleys back and forth.

To return for one last time to the basics of the case, this lawsuit constituted an attack on the Sorrentino letter, period. The procedural prong of the attack, we have concluded, was properly resolved by the District Court. But the "substantive"

attack was, properly conceived, that the Sorrentino directive was inconsistent with the pertinent statute and regulations. Like Judge Gasch, we find these issues to be easy of resolution for reasons already stated. It is, in short, only when we stray beyond the four corners of the letter itself that we enter the rather forbidding, indeed confusing, precincts of what designs are (or previously have been deemed) proper. It is as if the Sorrentino letter has emanations and penumbras, proceeding out of the letter but like great constitutional provisions not immediately discernible in the text of the document itself. This odd approach to an humble letter is conveyed in the following, previously quoted, paragraph of the Association's brief:

> The intended effect of this directive is not facially apparent because of the Director's overly simplistic use of the term "removable chassis." [The Association] believes that the policy implied in the letters severely and illegally limits the future growth and innovation in the industry.

Appellant's Brief at 9. What has become the "merits" portion of this litigation therefore has to do with "beliefs" entertained by the Association about "implications" seen flowing from the Sorrentino letter. Those "beliefs" have since found support in the way the Department has chosen to litigate this case, attempting to secure judicial approbation of the way HUD now characterizes its conduct over the years in a wide variety of design settings.

On reflection, we respectfully refuse to be drawn into the business of adjudicating such ephemeral points. If the Department, perhaps inspired by Sorrentinian emanations and penumbras, sees fit to reject a specific design, then that case, arising in a concrete setting, can be brought for resolution in the appropriate forum. But in the absence of any such specific action, the "merits" phase of this litigation has gone far beyond the modest confines of the legality of the Sorrentinian communication. That is to say, we decline the invitation, albeit graciously acceded in by a Department which succeeded below in litigating on a much broader front, to use the Sorren-tino letter as a springboard to review the breadth and depths of HUD regulation of manufactured housing designs. We will, instead, limit our adjudicatory efforts to the issues that were brought to court in the first instance. Mindful of the ancient admonition that sufficient unto the day is the evil thereof, we shall patiently await a concrete case of HUD disapproval of a particular design before embarking upon a judicial expedition aimed at measuring the fidelity of the agency's *specific regulatory action* to the statutory and regulatory regime that governs the arcane world of manufactured housing.

## VI

To recap, we affirm the District Court's judgment that the Sorrentino letter constituted an interpretative rule not requiring the full panoply of notice-and-comment procedures. We also sustain the trial court's further conclusion that the letter did not constitute an Interpretative Bulletin within the meaning of HUD's own regulations. We agree, furthermore, that the Sorrentino letter passes "reasonableness" muster by virtue of being only a restatement of existing law and regulations. Beyond that, however, we choose not to go. We therefore vacate the remaining portion of the judgment and accompanying opinion which sustains the propriety of HUD's various regulatory actions taken prior to the Sorrentino directive and which measures those actions for fidelity to Sorrentinian norms.

*Judgment accordingly.*